OF

# NORTH CAROLINA

AT

# RALEIGH

### SPRING TERM 1977

STATE OF NORTH CAROLINA EX REL. COMMISSIONER OF INSURANCE v. NORTH CAROLINA AUTOMOBILE RATE ADMINISTRATIVE OFFICE, NATIONWIDE MUTUAL INSURANCE COMPANY, STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, ALLSTATE INSURANCE COMPANY, THE AETNA CASUALTY AND SURETY COMPANY, HARTFORD ACCIDENT AND INDEMNITY COMPANY, GREAT AMERICAN INSURANCE COMPANY, UNITED STATES FIDELITY AND GUARANTY COMPANY, LUMBERMEN'S MUTUAL CASUALTY COMPANY, LIBERTY MUTUAL INSURANCE COMPANY, IOWA NATIONAL MUTUAL INSURANCE COMPANY, ST. PAUL FIRE AND MARINE INSURANCE COMPANY, UNIGARD MUTUAL INSURANCE COMPANY, THE SHELBY MUTUAL INSURANCE COMPANY, AMERICAN MOTORISTS INSURANCE COMPANY AND AMERICAN MUTUAL LIABILITY INSURANCE COMPANY

No. 90

(Filed 8 February 1977)

1. Insurance § 79.1— N. C. Automobile Rate Administrative Office — responsibilities

The N. C. Automobile Rate Administrative Office has the responsibility of maintaining rules and regulations and fixing rates for automobile bodily injury and property damage insurance, of promulgating and preparing rates for motor vehicle liability insurance, and of maintaining and furnishing to the Commissioner of Insurance the statistics on income derived from member companies from the investment of unearned premium reserves on automobile liability policies written in this state. G.S. 58-246.

1

---

Comr. of Insurance v. Automobile Rate Office

---

2. **Insurance §§ 1, 79.1— rate fixing — power of Commissioner and Rate Office**

     The N. C. Automobile Rate Administrative Office is vested with the primary authority to fix, adjust and propose rates, and the Commissioner of Insurance does not have concurrent authority with the Rate Office to fix or reduce rates.

3. **Insurance § 79.1— proposed rate increase — approval of all or part or none by Commissioner — decrease improper**

     When there is a filing for a proposed change in insurance rates pursuant to G.S. 58-248, the Rate Office may amend its filing so as to propose a smaller increase than that proposed in the original filing, but in the absence of such amendment, the Commissioner of Insurance upon proper findings of fact supported by substantial evidence may approve all of the increase proposed by the Rate Office, approve a part of the proposed increase, or disapprove the entire proposed increase; however, nothing in G.S. 58-248 authorizes the Commissioner to order a reduction in then existing rates.

4. **Insurance § 79.1— proposed rate increase — authority of Commissioner to order revision**

     In this proceeding under G.S. 58-248 in which the filing proposed an increase in insurance rates the Insurance Commissioner was without authority to fix a rate reducing the then existing rate; however, upon a determination in this proceeding that the rates charged or filed were excessive, inadequate, unreasonable, unfairly discriminatory or otherwise not in the public interest, the Commissioner could have properly exercised the authority granted to him by G.S. 58-248.1 and issued an order to the Rate Office directing that rates then existing or rates proposed in the filing before him be altered or revised in the manner and to the extent stated in such order to produce rates which were reasonable, adequate, not unfairly discriminatory and in the public interest. Such order would allow the Rate Office, the agency which possesses the primary authority to fix a just and adequate rate, an opportunity to propose adjustments in conformity with his decision.

5. **Insurance § 79.1— proposed rate decrease — authority of Commissioner to order greater decrease**

     The Commissioner of Insurance exceeded his statutory authority where the N. C. Automobile Rate Administrative Office requested a 13.3% reduction in bodily injury insurance rates, but the Commissioner ordered a 23.8% decrease in such rates thereby reducing existing rates in excess of the requested decrease without resorting to the authority granted him by the provisions of G.S. 58-248.1.

6. **Insurance § 79.1— property damage insurance rate change — failure to consider certain investment income**

     Evidence was sufficient to support findings by the Commissioner of Insurance that investment income from loss reserves and unearned premium reserves was not taken into account by the Rate Office in formulating its proposed rate changes for property damage insurance; and such investment profits data was relevant and material for rate-

making purposes, since G.S. 58-248 specifically provided that such information could be included in the rate-making formula in order to arrive at a fair and equitable rate.

7. **Insurance § 79.1— rate change proposal — no limitation on evidence to be considered**

G.S. 58-248 does not restrict the Insurance Commissioner, in considering a rate change proposal, to consideration of statistical data furnished by the Rate Office, and he may consider evidence from other sources if it is otherwise competent.

8. **Insurance § 79.1— hearings on proposed rate change — "fast track" data — effect of energy crisis — admissibility of evidence**

In hearings on a proposal to revise insurance rates charged for bodily injury and property damage liability insurance applicable to private passenger automobiles, certain "fast track" data which would indicate what effect, if any, the "energy crisis" was having on insurance companies' loss experience was not inadmissible *per se*, since rules adopted by the Insurance Advisory Board and in effect at the time of the hearings in question provided that all evidence of any type having reasonable probative value was admissible, and any evidence of the type upon which responsible persons were accustomed to rely in the conduct of insurance affairs was deemed to have reasonable probative value.

9. **Insurance § 79.1— rate reduction — effect of energy crisis — insufficiency of evidence**

Findings by the Insurance Commissioner which resulted in a 5% supplementary reduction in the rate level for property damage insurance were unsupported by substantial and material evidence where such findings were based on testimony by an out-of-state expert witness as to his theories concerning the effect of economic conditions and the energy crisis on N. C. drivers.

10. **Insurance § 79.1— proposed rate increase — trending factor — different application by Commissioner and Rate Office**

Though in the Rate Office's proposal for increased insurance rates property damage insurance trends were measured separately for paid claim costs and paid claim frequency, it was not error for the Commissioner of Insurance to apply the trending factor to the composite of average paid claim cost and frequency or the average loss cost per automobile.

11. **Insurance § 79.1— proposed rate change — trending loss experience**

The Commissioner of Insurance is considered to be a specialist in the field of insurance and his projection of past experience and present conditions into the future is assumed to be correct and proper if supported by substantial evidence; expert testimony, otherwise competent, that a trend upward or downward may reasonably be expected to continue into the future is evidence of reasonable and related factors which the Commissioner may consider in making his projections. Moreover, G.S. 58-248 does not require that procedures and methods for trending loss experience for the future shall be frozen.

12. **Insurance § 79.1— proposed rate change — trending period cut-off date — error by Insurance Commissioner**

Where the Rate Office selected 1 March 1976 as the trending period cut-off date, but the Insurance Commissioner trended the loss experience only until 1 April 1975, which was the projected effective date of the proposed rate revisions, the Commissioner failed to accomplish the purpose of G.S. 58-248 which contemplates a trending method which, on the basis of trends in past loss experience, projects the losses to be anticipated during the future period in which the proposed rates will be in effect.

13. **Insurance § 79.1— proposed rate change — trending past loss experience to future date — unity trend factor**

In trending past loss experience to a future date, the Commissioner of Insurance did not err in using a unity trend factor for the year of the energy crisis, the effect of which was to give no consideration for that period for the Commissioner's projection as to property damage rates, since the Commissioner's use of the unity trend factor was based on the evidence and testimony of an expert witness, and since the insurance companies benefited by the use of such factor.

14. **Insurance § 79.1— proposed rate change — retroactive rate-making**

Rate-making is a process which envisions a projection of past experience into the future to provide for a reasonable profit and nothing more; however, should hindsight reveal that rates validly instituted have failed to produce a reasonable profit, this would not warrant a recoupment of that deficit by an otherwise unjustified increase in future rates, since this would constitute retroactive rate-making.

15. **Insurance § 79.1— proposed rate change — retroactive rate-making**

The disapproval of a rate increase because of a "cushion" created by previously implemented and approved charges is not within the statutory authority granted the Insurance Commissioner by G.S. 58-248 to approve premium rates "for the future"; therefore, though the Commissioner properly made a finding, based upon substantial evidence, that "unallocated loss adjustment expenses did not rise at the same rate as the losses. . . ." he erred by taking into consideration past excess profits derived from previously approved and implemented rates.

16. **Constitutional Law § 23; Insurance § 79.1— automobile liability insurance rates — order not violative of due process rights**

Order of the Insurance Commissioner fixing the rate charged for bodily injury and property damage liability insurance applicable to private passenger automobiles lower than the then existing rate did not violate constitutional guarantees of due process or subject appellees to confiscatory rates.

17. **Insurance § 79.1— rate change hearings — actions of Insurance Commissioner — no violation of constitutional procedural provisions**

In hearings on a proposal for the revision of rates charged for bodily injury and property damage liability insurance, the Insurance

Comr. of Insurance v. Automobile Rate Office

Commissioner did not act arbitrarily or capriciously or assume the role of consumer advocate in such a manner that his order violated constitutional procedural provisions.

APPEAL from the decision of the Court of Appeals, 30 N.C. App. 427, 227 S.E. 2d 603, reversing the order of the Commissioner of Insurance entered on 28 March 1975. *Martin, J.,* dissented. This case was docketed and argued as No. 141 at the Fall Session 1976.

On 1 July 1974 the North Carolina Automobile Rate Administrative Office (hereafter referred to as Rate Office), pursuant to G.S. 58-248, filed with the Commissioner of Insurance a request for a revision in the rates charged for bodily injury and property damage liability insurance applicable to private passenger automobiles. This filing was based upon the underwriting experience of the member companies for the two-year period ending on 30 June 1973 and also upon an upward trend in average paid claim costs for claims paid between 1 October 1970 and 30 September 1973. The proposed rate revision called for a reduction of 3.7% for bodily injury liability rates and an increase of 11.4% for property damage liability rates, or an overall average increase of 3.2%.

On 26 September 1974 the Attorney General intervened in behalf of the using and consuming public of the State of North Carolina.

Three pre-hearing meetings were held. As a result of these hearings the Commissioner requested that the Rate Office furnish more recent data than that upon which its filing was based. In particular, certain "fast track" data was sought, which would indicate what effect, if any, the "energy crisis" was having on insurance companies' loss experience. The Commissioner also requested data showing the average paid claim frequency, a trending factor not theretofore employed in the rate-making procedures of the Rate Office.

The Rate Office submitted an amended filing to the Commissioner on 2 January 1975, proposing a rate level reduction of 13.3% for bodily injury and a rate level increase of 22.5% for property damage, or an overall average increase of 0.9%. This amended filing reflected a change in procedure to include a trend factor based upon trends in average paid claim frequency, in addition to trends in average paid claim costs. The

trending period was also changed to extend fourteen months beyond the filing date, rather than the previously employed period of three months from the date of the filing.

The Commissioner conducted public hearings on the proposed rate revisions on 25, 26 November 1974, 10 December 1974, 6, 7, 15, 21, 22, 23, 24, 27, 28, 29 January 1975, 4, 7 February 1975, and 10, 17 March 1975. In support of the rate adjustments requested in the amended filing, the Rate Office relied primarily upon the testimony of Paul L. Mize, General Manager of the Rate Office, John J. Kollar, Assistant Actuary with Insurance Services Office, and John H. Muetterties, Vice President of Insurance Services Office. The Insurance Department staff presented the testimony of Phillip K. Stern, Actuary with the New Jersey Department of Insurance, which testimony formed the principal basis for the findings of fact entered by the Commissioner in his final order. The testimony presented at these hearings and the Commissioner's final order will be hereinafter more fully discussed.

On 28 March 1975 the Commissioner entered an order directing that private passenger automobile liability insurance rates be reduced by 23.8% for bodily injury and increased by 2.5% for property damage, for an overall average decrease of 13.0%, to become effective on 1 May 1975.

The Rate Office and the member companies which are parties to this action appealed from this order. The Court of Appeals reversed the order of the Commissioner, holding that it was not supported by material and substantial evidence. From the decision of the Court of Appeals, the State of North Carolina, ex rel. Commissioner of Insurance appealed to this Court, pursuant to G.S. 7A-30(2).

*Attorney General Edmisten, by Assistant Attorney General Isham B. Hudson, Jr.; Hunter & Wharton, by John V. Hunter III, for Commissioner of Insurance, appellant.*

*Allen, Steed and Allen, P.A., by Arch T. Allen, Thomas W. Steed, Jr., and Arch T. Allen III; Broughton, Broughton, McConnell & Boxley, P.A., by J. Melville Broughton, Jr.; Young, Moore, Henderson & Alvis, by Charles H. Young; Manning, Fulton & Skinner, by Howard E. Manning, for defendant, appellee.*

BRANCH, Justice.

The first question presented by this appeal is whether the order of the Commissioner was in excess of his statutory authority.

The provisions of Chapter 58 of the North Carolina General Statutes have recently been fully reviewed in *Comr. of Insurance v. Automobile Rate Office*, 287 N.C. 192, 214 S.E. 2d 98 and in *In re Filing by Automobile Rate Office*, 278 N.C. 302, 180 S.E. 2d 155. Nevertheless, we find it necessary to review certain portions of the statute contained in that chapter.

[1] The North Carolina Automobile Rate Administrative Office was created as a branch of the Compensation Rating and Inspection Bureau of North Carolina and its objects and functions are enumerated in G.S. 58-246. That statute empowers and fixes the Rate Office with the responsibility of maintaining rules and regulations and fixing rates for automobile bodily injury and property damage insurance. The statute provides further that the bureau should promulgate and prepare rates for motor vehicle liability insurance. It also requires the bureau to maintain and furnish to the Commissioner of Insurance the statistics on income derived by member companies from the investment of unearned premium reserves on automobile liability policies written in this state.

We consider the provisions contained in G.S. 58-248 and G.S. 58-248.1 to be crucial in deciding this assignment of error. We, therefore, quote pertinent provisions from these statutes.

G.S. 58-248, in pertinent part, provides:

. . . All such rates compiled and promulgated by such bureau shall be submitted to the Commissioner of Insurance for approval and no such rates shall be put into effect in this State until approved by the Commissioner of Insurance and not subsequently disapproved. . . .

In determining the necessity for an adjustment of rates the Commissioner shall give consideration to past and prospective loss experience, including the loss-trend and other relevant factors developed from the latest statistical data available; to such relevant economic data from reliable indexes which demonstrate the trend of costs relating to the line of automobile insurance for which rates

are being considered and to such other reasonable and related .factors as are relevant to the inquiry. The bureau in promulgating and fixing rates shall consider the same factors and shall prepare and present such information, data, indexes and exhibits with rate filings.

The Commissioner shall approve proposed changes in rates, classifications or classification assignments to the extent necessary to produce rates, classifications or classification assignments which are reasonable, adequate, not unfairly discriminatory, and in the public interest. Proposed rates shall not be deemed unreasonable, inadequate, unfairly discriminatory or not in the public interest, if such proposed rates make adequate provision for premium rates for the future which will provide for anticipated loss and loss adjustment expenses, anticipated expenses attributable to the selling and servicing of the line of insurance involved and a provision for a fair and reasonable underwriting profit.

On or before July 1 of each calendar year the North Carolina Automobile Rate Administrative Office shall submit to the Commissioner the data hereinabove referred to for bodily injury and property damage insurance on private passenger vehicles and a rate review based on such data. Such rate proposals shall be approved or disapproved by the Commissioner in writing within 90 days after submission to him: Provided, the Commissioner shall have at least 30 days after the completion of hearings and the receipt of any additional data requested from the North Carolina Automobile Rate Administrative Office in which to consider the rate proposals.

G.S. 58-248.1, *inter alia*, states:

Whenever the Commissioner, upon his own motion or upon petition of any aggrieved party, shall determine, after notice and a hearing, that the rates charged or filed on any class of risks are excessive, inadequate, unreasonable, unfairly discriminatory, or otherwise not in the public interest, or that a classification or classification assignment is unwarranted, unreasonable, improper or unfairly discriminatory he shall issue an order to the bureau directing that such rates, classifications or classification assignments be altered or revised in the manner and to the extent

stated in such order to produce rates, classifications or classification assignments which are reasonable, adequate, not unfairly discriminatory, and in the public interest.

[2]   The Rate Office and the Commissioner possess only such respective powers as are granted by the General Assembly. Our decisions construing Chapter 58 of the General Statutes firmly establish that the Rate Office is vested with the primary authority to fix, adjust and propose rates and that the Commissioner of Insurance does not have *concurrent* authority with the Rate Office to fix or reduce rates. *In re Filing by Automobile Rate Office, supra.* It is equally clear that the provisions of G.S. 58-248 mandate that no rates shall be put into effect until approved by the Commissioner and that existing rates will remain in effect until validly disapproved by him.

The provisions of Chapter 58 and our decisions relating thereto fail to clearly state the exact procedure to be followed by the Commissioner when the proposed rates are submitted to him for approval under G.S. 58-248 or upon a determination by him pursuant to G.S. 58-248.1 that the rates are excessive, inadequate, unreasonable, unfairly discriminatory, or otherwise not in the public interest.

[3]   We first consider the provisions of G.S. 58-248 which provide that "[a]ll such rates compiled and promulgated by such bureau shall be submitted to the Commissioner of Insurance for *approval* and no such rates shall be put into effect in this State until *approved* by the Commissioner of Insurance and not subsequently *disapproved.* . . . The Commissioner shall *approve* proposed changes in rates . . . *to the extent* necessary to produce rates . . . which are reasonable, adequate, not unfairly discriminatory, and in the public interest. . . . " [Emphasis ours.] When there is a filing pursuant to G.S. 58-248 the Rate Office may, as was done here, amend its filing so as to propose a smaller increase than proposed in the original filing, but in the absence of such amendment the Commissioner upon proper findings of fact supported by substantial evidence *may approve all of the increase proposed by the Rate Office, approve a part of the proposed increase or disapprove the entire proposed increase. In re Filing by Fire Ins. Rating Bureau,* 275 N.C. 15, 165 S.E. 2d 207. We find nothing in G.S. 58-248 or in this Court's interpretation of that statute which authorizes the Commissioner to order a reduction in then existing rates.

Under this statute he may approve in toto, approve in part, or totally disapprove the rates *proposed.*

We next consider the procedure to be followed by the Commissioner under G.S. 58-248.1. Under that section when the Commissioner determines, after notice and hearing, that the rates charged or filed are excessive, inadequate, unreasonable, unfairly discriminatory, or otherwise not in the public interest, he shall issue an order to the Rate Office directing that such rates be altered or revised in the manner or to the extent stated in such order so as to produce rates which are reasonable, adequate, not unfairly discriminatory and in the public interest. It is from this statute that the Commissioner derives his authority to affirmatively order that reasonable and adequate rates be fixed.

We find *In re Rating Bureau,* 245 N.C. 444, 96 S.E. 2d 344, to be a case which gives guidance as to the procedure to be followed by the Commissioner when acting under this statute in response to an unwarranted, unreasonable, improper or unfairly discriminatory filing. There the North Carolina Fire Insurance Rating Bureau filed with the Commissioner of Insurance in November 1955 a request for a 25% increase in fire insurance rates on farm property. Evidence produced at the hearing on this filing indicated that in an October 1954 filing the Rating Bureau had sought a rate increase of 16% for farm dwellings. The Commissioner found that the evidence presented at the 1954 hearing did not support the Rating Bureau's contention that farm and non-farm dwellings presented different classes of risk, when both types of dwellings are similar in location and construction and are subject to the same degree of fire protection. This ruling modified risk classifications approved in 1947 which placed farm and non-farm property in different classes for rate-making purposes. On the basis of this unjustified classification in the 1954 filing, the Commissioner disapproved the requested 16% increase and allowed the Rating Bureau an opportunity to propose new rate adjustments based on proper classifications. The Rating Bureau took no appeal from the Commissioner's order disapproving its original filing. Instead it ignored the order and filed the November 1955 request, based upon the same classifications expressly disapproved previously by the Commissioner. The Commissioner rejected the filing, again on grounds that there was no evidence to support the Rating Bureau's proposed differential in fire insurance

rates on unprotected farm dwellings and unprotected non-farm dwellings.

The pertinent portion of that decision was directed to the part of G.S. 58-131.2 which states:

> Whenever the Commissioner finds, after notice and hearing, that the Bureau's application of an approved rating method, schedule, classification . . . is unwarranted, unreasonable, improper or unfairly discriminatory he shall order the Bureau to revise or alter the application of such rating method, schedule, classification . . . in the manner and to the extent set out in the order.

The language of this statute parallels the statutory declaration found in G.S. 58-248.1 concerning the Commissioner's powers and duties in an automobile rate case upon a finding that the rates filed are excessive, inadequate, unreasonable, unfairly discriminatory or otherwise not in the public interest.

In affirming the Commissioner's action, this Court stated: "[I]n accord with the provisions of the statute [G.S. 58-131.2], the Commissioner left the matter open so that the Rating Bureau might have an opportunity to propose adjustments in conformance with the decision [disapproving the filing]."

Interpretation placed upon G.S. 58-131.2 by the Court in *In re Rating Bureau, supra,* applies with equal force to G.S. 58-248.1 as it relates to the facts of instant case.

[3, 4]  We conclude that in this proceeding pursuant to a filing under G.S. 58-248 the Commissioner was authorized to approve the filing in toto, approve the filing in part, or disapprove the filing. In a proceeding under this statute in which the filing proposes an increase in rates the Commissioner is without authority to fix a rate reducing the then existing rate. However, upon a determination in this proceeding that the rates charged or filed were excessive, inadequate, unreasonable, unfairly discriminatory or otherwise not in the public interest, the Commissioner could have properly exercised the authority granted to him by G.S. 58-248.1 and issued an order to the Rate Office directing that rates then existing or rates proposed in the filing before him be "altered or revised in the manner and to the extent stated in such order to produce rates . . . which are reasonable, adequate, not unfairly discriminatory, and in the public interest." By so doing he would have left the matter open so

that the Rate Office, the agency which possesses the primary authority to fix a just and adequate rate, might have an opportunity to propose adjustments in conformity with his decision. *In re Rating Bureau, supra; Monroe v. Insurance Services Office of Arkansas,* 257 Ark. 1018, 522 S.W. 2d 428.

We here note that the Commissioner's powers granted under G.S. 58-248.1 are not limited to instances growing out of a G.S. 58-248 filing but he may upon his own motion or upon petition of any aggrieved party exercise the powers as granted to him by the statute (G.S. 58-248.1) with respect to rates "filed or *charged.*" See *Insurance Serv. Office v. State Bd. for Prop. & Cas. R., Okl.,* 530 P. 2d 1359.

[5]    The Rate Office, by its amended filing, requested a 13.3% reduction in the bodily injury rates. The Commissioner ordered a 23.8% decrease in such rates thereby reducing existing rates in excess of the requested decrease without resorting to the authority granted him by the provisions of G.S. 58-248.1. By so doing, he exceeded his statutory authority.

The Rate Office, by its amended filing, proposed a rate increase of 22.5% for property damage insurance and the Commissioner ordered a rate increase of 2.5%. He thereby approved in part the filing of the Rate Office as to property damage rates. Thus be acted within his statutory authority if his findings and order were supported by material and substantial evidence. G.S. 58-9.4; *In re Filing by Fire Ins. Rating Bureau, supra; Comr. of Insurance v. Automobile Rate Office, supra.*

We recognize that the provisions of G.S. 58-248 might have been written so as to give the Commissioner more authority as a rate-maker or so as to provide a more expeditious procedure in altering proposed rates. However, this Court cannot, under the guise of judicial interpretation, interpolate into the statute provisions which are wanting. 7 N. C. Index 2d, Statutes § 5, p. 70; *Board of Education v. Wilson,* 215 N.C. 216, 1 S.E. 2d 544.

We, therefore, must turn to the question of whether the findings and order approving in part the requested property damage rate increase were supported by material and substantial evidence.

[6]    One of the factors considered by the Commissioner in ordering a smaller increase in property damage rates than requested by the Rate Office was the anticipated earnings of the

participating insurance companies realized from the investment of unearned premium reserves and loss reserves.

The Commissioner made the following findings of fact, pertinent thereto:

> 16. That the rate changes proposed by the Rate Office are based on a rate-making formula containing an allowance of 5% of earned premium for underwriting profit and contingencies.

> 17. That the annual return from the investment of unearned premium reserves and loss reserves for all private passenger automobile liability insurance in North Carolina is 2.3% of earned premium, based on the latest available statistics.

> 18. That an underwriting profit of 2.7% of earned premium provides for a fair and reasonable underwriting profit within the meaning of G.S. 58-248, which finding is supported by the testimony of expert witness Stern.

> 19. That adding said 2.3% return to said 2.7% allowance for underwriting profit to arrive at a 5% of earned premium allowance for overall profit and contingencies is an equitable manner of including the amount of earnings from the investment of unearned premium reserves and loss reserves in the rate-making formula, which finding is supported by the testimony of expert witness Stern, and which procedure was set forth and followed in the last order (by the former Commissioner) effecting private passenger automobile liability insurance rate changes, which order was affirmed by the North Carolina Court of Appeals. 18 N.C. App. 23, 195 S.E. 2d 572 (1973), *cert. denied* 283 N.C. 585 (1973).

The ultimate question facing the Commissioner is whether an increase in premium rates is necessary to "provide for anticipated loss and loss adjustment expenses, anticipated expenses attributable to the selling and servicing of the line of insurance involved and a provision for a *fair and reasonable underwriting profit*." G.S. 58-248. [Emphasis ours.] Whether provision has been made for a "fair and reasonable underwriting profit" is not "a question upon which the determination of the Bureau is conclusive. It is a question of fact to be determined by the Commissioner upon evidence. As to this, as well as to the other

factors in the equation, the burden of proof is upon the Bureau to show that the existing premium rates are not sufficient." *In re Filing by Fire Ins. Rating Bureau, supra.*

Appellees opposed the use of data relating to profits from these types of investments, contending (1) that this factor had been duly considered by the Rate Office in formulating its proposed rate changes, and (2) that such data is not relevant and material for rate-making purposes.

We do not believe that the evidence adduced at the hearings on this filing supports the Rate Office's contention that investment income had been taken into account in arriving at the new proposed rates. Mr. Mize, General Manager of the Rate Office, testified on cross-examination that the 1971 filing (upon which present rates are based) had been reduced by two percentage points to account for this investment income. He acknowledged, however, that "[i]nvestment income from loss reserves and unearned premium reserves has not been taken into consideration arithmetically in preparing the proposed rate change contained in RO Exhibit 22 [the 2 January 1975 amended filing]." Similarly, Mr. Muetterties of Insurance Services Office testified that "it is the position of insurance companies, it is the position of Insurance Services Office, that in order to write the business that it is necessary to have the five percent profit, plus the so-called other income, investment income, in addition, and not to subtract it off." The record also reveals the following exchange between the Commissioner and Mr. Muetterties:

> THE COMMISSIONER: In other words, you think that your profit should be totally based on the premiums written and that the insurance companies should receive five percent, plus the two point three percent, or a total of seven point three percent, not of their investment, but seven point three percent of the premiums written, is that correct?
>
> MR. MUETTERTIES: Yes, sir. . . .

It is apparent that the formula employed by the Rate Office in deriving its proposed rate included a provision for a five percent underwriting profit, but did not account for anticipated profits from investments of loss reserves and unearned premium reserves.

The Rate Office's objection to the use of this investment profits data on grounds that it is not relevant and material for

rate-making purposes is overcome by G.S. 58-248 which provides:

> . . . The Commissioner of Insurance in considering any rate compiled and promulgated by the bureau may take into consideration the earnings of all companies writing automobile liability insurance in this State realized from the investment of unearned premium reserves and investments from loss reserves on policies written in this State. The amount of earnings may in any equitable manner be included in the rate-making formula to arrive at a fair and equitable rate.

The testimony of witness Stern, upon which the Commissioner based his determinations with respect to the investment and underwriting profits, was, in part, as follows:

> . . . First, let me say that there is no evidence other than historical to support the 5 per cent provision. Attempts to establish a rational basis for the 5 per cent have failed . . . . The insurance business is different from any other business, because its working capital generates income. If a manufacturer buys equipment and builds a factory and puts ten million dollars into it, that money is used up; if anything, it depreciates. If an insurance company starts with ten million capital, that money generates income, investment income . . . . Now, if you operate on a two-to-one ratio, that means, in terms of premiums, you need a return of three and a half per cent after tax and that is the situation in New Jersey today. Now, the operating return consists of the return from the rates and the return from the investment of the unearned premium reserves and loss reserves. We are dealing here—we have calculations here indicating this return is two point three per cent—that is the investment income. I was guided by my knowledge of the things I have recited and I subtracted two point three per cent from three point five, not from five, the three point five per cent return, after tax, in terms of premium and I get one point two per cent after federal income tax. The rates have to contain a loading to provide for the tax liability and applying the 48 per cent income tax bracket to that 1.2 per cent, I arrived at 2.4; however, I was informed that a shortcut method in North Carolina used in the past was to subtract the 2.3 from the 5. It is arithematically not correct, but it gives you the same answer; you get 2.7 instead of my 2.4.

And that's another little cushion which is not significant enough to spend a lot of time upon it. So this is how we arrived at the 2.7 per cent provision for underwriting profit in the rates. . . .

\*     \*     \*

It's my opinion, under the circumstances in this case and after reviewing the filing, that the 2.7 per cent for underwriting profit and contingencies would be just and reasonable.

"Substantial evidence has been described as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Comr. of Insurance v. Automobile Rate Office, supra.* When measured by this standard, we believe that the testimony of witnesses Stern, Mize and Muetterties constitutes material and substantial support for the Commissioner's findings, conclusions, and order as they relate to the inclusion of profits from investments of loss reserves and unearned premium reserves in the rate-making formula.

We next consider whether there was material and substantial evidence to support the Commissioner's findings which resulted in a 5% supplementary reduction in the rate level for insurance on private passenger automobiles.

The pertinent findings as to the challenged "fast track energy data" relating to the supplementary 5% reduction in rates are:

25. That the National Association of Insurance Commissioners "energy crisis" experience for North Carolina collected under said plan or system represents the private passenger automobile liability insurance loss experience for companies writing approximately 65% of the total premium volume for such insurance in North Carolina and that therefore such experience is significant for rate-making purposes in North Carolina, which finding is supported by the testimony of expert witness Stern.

26. That evidence in the record, including the "energy crisis" data collected under said plan or system, shows a need for a supplementary reduction in the rate level in addition to those changes set forth above, which finding is supported by the testimony of expert witness Stern.

Comr. of Insurance v. Automobile Rate Office

27. That said "energy crisis" data reflect the results of the reduction in speed limits, the unavailability of gasoline for some time, and the continued lesser accessibility of gasoline to many because of increased costs, which findings are supported by the testimony of expert witness Stern.

\*          \*          \*

29. That, taking the latest information available, including the "energy crisis" data referred to above, along with other relevant factors, such as the rate unemployment in North Carolina, demonstrates the need for a supplementary rate level reduction factor of five (5) percentage points for both bodily injury and property damage rates in addition to those changes set forth above, which reduction is a "one-step trend" resulting in a total rate level change indication of a 23.8% reduction in bodily injury rates and a 2.5% increase in property damage rates, which finding is supported by the testimony of expert witness Stern, who reached this conclusion based on all the business done by all companies in North Carolina.

30. That such a further 5% reduction is a conservative reduction which gives full consideration to the partially offsetting effect of inflation, which finding is supported by the testimony of expert witness Stern.

The factors to be considered by both the Commissioner and the Rate Office are set forth in G.S. 58-248 as follows:

. . . The Commissioner of Insurance in considering any rate compiled and promulgated by the bureau may take into consideration the earnings of all companies writing automobile liability insurance in this State realized from the investment of unearned premium reserves and investments from loss reserves on policies written in this State. The amount of earnings may in an equitable manner be included in the rate-making formula to arrive at a fair and equitable rate.

In determining the necessity for an adjustment of rates the Commissioner shall give consideration to past and prospective loss experience, including the loss-trend and other relevant factors developed from the latest statistical data available; to such relevant economic data from reliable indexes which demonstrate the trend of costs relating to the line of automobile insurance for which rates are being

considered and to such other reasonable and related factors as are relevant to the inquiry. The bureau in promulgating and fixing rates shall consider the same factors and shall prepare and present such information, data, indexes and exhibits with rate filings.

It is, therefore, apparent that when a filing is made the ratemaker, must of necessity, estimate what will happen in the future. The natural guide is past experience and our statute specifically provides for consideration of factors relating to past experience.

In *Comr. of Insurance v. Automobile Rate Office, supra,* we held that G.S. 58-248.1 did not authorize the Commissioner to consider emergency considerations such as the energy crisis and enter an *interim* rate order based thereon because such action infringed upon the authority of the Rate Office to fix a just and adequate rate. Instant case differs from *Comr. of Insurance v. Automobile Rate Office, supra,* in that here we consider only the partial approval of a proposed annual filing pursuant to the provisions of G.S. 58-248.

[7] The language of G.S. 58-248 does not restrict the Commissioner's consideration to the statistical data furnished by the Rate Office and he may consider evidence from other sources if it is otherwise competent. *Comr. of Insurance v. Automobile Rate Office, supra.*

[8] We do not agree with the position of the Rate Office that the "fast track" evidence was *per se* inadmissible. Our conclusion is strengthened by the language contained in § 6 of the rules adopted by the Insurance Advisory Board pursuant to authority contained in G.S. 58-27.1. That section, which was in effect at the time of these hearings, provides:

6. Public hearings shall be conducted in an orderly but informal manner. *The hearing officer shall admit all evidence of any type having reasonable probative value,* and shall include in the evidence any relevant or material evidence which may be made available to him by any records of the Insurance Department or disclosed by any investigation or study of the problem by personnel of the Department. Irrelevant, immaterial or unduly repetitious evidence shall be excluded. *Any evidence of the type upon which responsible persons are accustomed to rely in the*

*conduct of insurance affairs shall be deemed to have reasonable probative value.* A hearing may be continued when such continuation is, in the Commissioner's judgment, warranted.

We, therefore, turn to the question of whether the Commissioner's findings as to the supplementary 5% decrease in property damage rates were supported by material and substantial evidence.

[9]  We agree with the conclusions of the Court of Appeals that there was no substantial and material evidence in this record to support the Commissioner's findings which resulted in a 5% supplementary reduction in the rate level for property damage insurance.

Initially we note that the amended filing of 2 January 1974 must have appreciably diminished the importance of the "fast track" data. This filing, based on statistical information as to the frequency of property damage claims, largely reflected the effect of the energy crisis. The Commissioner relied mainly upon the testimony of the witness Stern to support his findings. Stern's testimony, which he termed "qualitative information which should be looked upon with great care," was, in part, as follows:

. . . [W]e looked at the latest data for the eleven months, comparing eleven months of 1974 compared with the eleven months of 1973, Exhibit ID 53, which indicated a substantial decrease in frequencies in bodily injury of thirteen percent and a property damage pure premium decrease of six percent. There are other relevant factors which affect the cost of insurance, or the occurrence of losses. The reduced—the reduction in the driving and the use of automobiles is not only affected by availability of gasoline, but also by the price of gasoline. Many people have to restrict their driving because of the high cost of gasoline compared with normal times, the years reflected by the accident year experience 1972 and '73, the early part of '73, because the accident year experience ends on June 30, 1973. Another important element that affects the exposure to road hazards is the economic condition of the country, particularly North Carolina. Today's newspaper reports that the unemployment rate in North Carolina is ten point six percent. It must be obvious that people who have to live on un-

employment insurance benefits must be restricting many activities and driving should be one of the first ones to restrict. They are troubled by inflation and unemployment, now. It will also affect drinking habits. We know that driving after drinking is one of the very frequent causes of serious injury. Apparently people are unemployed, they won't go to the bar, they are lucky they can drink their beer at home, which means they won't drive after they have their beer. And I think prior recessions have shown that, that during a period of recession of reduced activity insurance experience does show an improvement. Now these are qualitative characteristics—we cannot quantify them for you, except for what we have already presented here. I conclude that taking all these factors together, a supplementary rate level reduction factor of five percentage points would be more than justified. . . .

The witness Stern stated that he considered the amended filing but he obviously based his conclusion that the 5% supplementary reduction was justified on the basis of the above-quoted evidence. To emphasize the lack of probative force in this evidence, we point to a few of the witness' questionable deductions. The witness used the complicated economic factor of unemployment figures which he had plucked from some newspaper account to support his conclusion that unemployment would keep people from drinking in bars in a state which does not allow legalized sale of liquor by the drink. He then reaches the dubious conclusion that a man who becomes intoxicated in his home will remain in his abode. His statement that the high cost of gasoline restricts driving is not supported by any evidence. In short, there was no material or substantial evidence in this record to support the Commissioner's findings relative to a 5% suplementary decrease in property damage rates.

The Rate Office further argues that the Commissioner erred by using a different methodology in trending past loss experience to a future date when he approved, in part, its proposed increase in the property damage rate.

On the basis of the changes in methodology, hereinfter discussed, the Commissioner made the following findings of fact:

9. That property damage pure premium for all companies writing private passenger automobile liability insurance in North Carolina for the annual periods ending at

the end of each quarter from June 30, 1971, through March 31, 1974, reflects an annual increase of 4.8% per year, based on an actuarially acceptable line of best fit method, which finding is supported by the testimony of expert witness Stern.

\* \* \*

11. That a property damage pure premium trend factor of 1.108 provides an adequate property damage loss tend adjustment for the amended filing (derived from the finding of a 4.8% increase per year and a 2.25-year period), which finding is supported by the testimony of expert witness Stern.

[10] In the Rate Office filing, property damage insurance trends were measured separately for paid claim costs and paid claim frequency. The Commissioner chose instead to apply the trending factor to the composite of average paid claim cost and frequency or the average loss cost per automobile. This change in the Rate Office's trending procedure was based upon the following testimony of witness Stern:

. . . [T]he way ISO does it and that's reflected in this amended filing, the trend is measured separately for average paid claim costs and average paid claim frequency, and then the two are combined in some manner. . . . In each case fitting the line to the actual data, you have to do some balance to the data—you have to stretch them or cut them and make them fit, so you're actually introducing two elements of possible error and that was statistical error, not wrongdoing, statistical error. My personal feeling is that a more straightforward method would be to combine claim frequency and claim cost into a quantity which we refer to as a pure premium. Pure premium is simply the average loss cost per car and the loss cost per car depends upon how much you pay on the average per claim and how many claims you have on the average per car. It is the most straightforward method of measuring really what it costs to insure cars, so I simply took the data shown in the filing for claim cost and claim frequency and I combined them into a pure premium, which is a simple arithmetic calculation of multiplying frequency by claim cost . . . .

[11] The Commissioner of Insurance is considered to be a specialist in the field of insurance and his projection of past

experience and present conditions into the future is assumed to be correct and proper if supported by substantial evidence. Expert testimony, otherwise competent, that a trend upward or downward may reasonably be expected to continue into the future is evidence of "reasonable and related factors" which the Commissioner may consider in making his projections. *The statute does not require that procedures and methods for trending loss experience for the future shall be frozen. See In re Filing by Fire Ins. Rating Bureau, supra.*

The expert witness' deduction that by combining two separate inexact calculations into a single one reduces the possibility of error is bolstered by common logic and constituted substantial evidence in support of the pertinent findings of fact and the minor alteration used by the Commissioner in the trending method.

[12]    The Commissioner also deviated from the trending period used by the Rate Office in its amended filing. The Rate Office had employed a projection period extending to 1 March 1976. In lieu of that date, the Commissioner trended the loss experience only until 1 April 1975, which was the projected effective date of the proposed rate revisions. The only evidence justifying the selection of 1 April 1975 as the trending period cut-off date was the following testimony of witness Stern:

> As to why I selected the date of April 1, 1975 as the point to which to project my trend in the future, that would be approximately the date normally a rate revision would be effective if it is considered at this time and I did not want to go beyond and I don't think—suggest that you go beyond the effective date of the rate revision, because a new review based upon data for a later year is due on July 1, '75.

We believe it was unrealistic to assume that the annual rate filing which would become due on 1 July 1975 would be put into effect with such dispatch as to properly project more recent loss trends into the future. The very fact that we are now considering an amended annual filing first proposed over two years ago and that rates presently in existence are those based upon a 1971 filing, makes it apparent that the institution of proposed rate revisions is a process fraught with delay.

G.S. 58-248 requires that "the Commissioner shall give consideration to past and *prospective* loss experience . . . . "

Comr. of Insurance v. Automobile Rate Office

[Emphasis ours.] This statutory provision contemplates a trending method which, on the basis of trends in past loss experience, projects the losses to be anticipated during the future period in which the proposed rates will be in effect. The trending period used by the witness Stern fails to accomplish this purpose.

[13]   Appellees also object to the Commissioner's action in using a unity trend factor for the year of the energy crisis, contending that the energy crisis did not exist during the entire year. The effect of using the unity factor for that year was to give no consideration for that period for the Commissioner's projection as to property damage rates, thereby using a period of two and one-fourth years for his projection of such insurance rates.

The testimony of the Rate Office's expert witness Mr. Muetterties in respect to the factor was:

> . . . Mr. Stern uses a trend of unity—by unity that means really no trend upward or downward—A little over a year ago I remember sitting in some long lines for getting gas up in New Jersey, myself, and that my wife got tired of doing it and I had to do it a couple of times, but I don't remember that the period of the energy crisis was one year long, which Mr. Stern used as unity. I believe the period was a shorter period than that. There is a major and substantial difference between this. . . .

On the other hand, the expert witness Stern testified:

> . . . [H]owever, during that period there is that one year of the energy crisis; that is, the figures we have just referred to before, where we saw that there were substantial reductions in claim frequencies and in pure premiums. Therefore, I decided for the purpose of this exhibit to assume that we apply a unity trend factor for that one year —therefore, we get, instead of three and a quarter years, a projection for one and a quarter years—I'm sorry, for two and a quarter years, . . . .

The record also contains evidence that pure premium costs for property damage insurance dropped from $20.46 for the year 1973 to $19.26 for the year 1974 (the period trended at unity by the witness Stern), a reduction of 6%. Based upon this evidence and other evidence which the statute required the Commissioner to consider, he found:

7. That a period of 2.25 years is a reasonable period for computing a pure premium trend factor for the amended filing, which finding is supported by the testimony of expert witness Stern.

\* \* \*

11. That a property damage pure premium trend factor of 1.108 provides an adequate property damage loss trend adjustment for the amended filing (derived from the finding of a 4.8% increase per year and a 2.25-year period), which finding is supported by the testimony of expert witness Stern.

\* \* \*

20. That all of the factors, allowances, and adjustments supplied by expert witness Stern are reasonable, proper, and correct.

It is impossible for us to determine the exact effect of the unity factor for the year 1974 in trending property damage rates. However, the record discloses competent and relevant evidence tending to show that the pure premium costs for property damage insurance decreased during an eleven-month period of that year. "The pure premium is the amount allocated for the settlement of casualty losses, including loss adjustment expenses." *In re Filing by Automobile Rate Office, supra.*

The Commissioner elected to accept, as he may do, the evidence and the testimony of the witness Stern. Under these circumstances, it would seem that the insurance companies would have benefited by the omission of this period of time from the Commissioner's consideration of projected rates for property damage insurance.

Also, in trending loss experience into the future, the Commissioner declined to apply the trend factors to unallocated loss adjustment expenses. This change in the trending method is reflected in the following findings of fact:

12. That the factor applied to the combination of losses and allocated loss adjustment expenses to allow for unallocated loss adjustment expenses has over the years gone down, which means that the unallocated loss adjustment expenses did not rise at the same rate as the losses, and that including said factor in the losses before applying loss development and loss trend adjustments, as heretofore has

been done in North Carolina, has resulted in an excessive allowance for loss adjustment expenses and has produced a "cushion," i.e., an excessiveness, in the present rates, which finding is supported by the testimony of expert witness Stern.

13. That the proper way of treating unallocated loss adjustment expenses in the rate-making formula is to make an allowance for such expenses as an expense item with a trend adjustment for the effect of inflation on such expenses, instead of applying loss development or loss trend adjustments to such expenses (as has heretofore has been done in North Carolina), and that the "cushion" in the premium rates referred to in the preceding finding of fact would be adequate to absorb an inflationary trend in such expenses for the amended filing, which finding is supported by the testimony of expert witness Stern.

The Commissioner relied upon the following testimony of the witness Stern for support of these findings:

. . . The unallocated loss adjustment expenses historically have not followed the same trend as losses have shown. As a matter of fact, the factor over the years has gone down, which means that the unallocated loss adjustment expenses did not rise at the same rate as the losses and that is understandable. This is an overhead item. For example, if you have more claims—as you know, in any business you can absorb a certain amount of increase without changing your staff—conversely, if there are fewer claims, you're not going to fire five people just because last month there was no ice, so it's a more stable overhead expense.

\*      \*      \*

. . . I conclude that it would be improper to apply either a loss development factor or a trend factor to this portion of the total rate structure . . . .

By not applying trend factors to the unallocated loss adjustment expenses, the Commissioner failed to provide for future inflationary increases in many expense items, such as salaries, rents, equipment, and supplies. He attemped to justify this by his finding that improper treatment of this item in previously implemented rate-making procedures had created a "cushion" which would adequately absorb future inflationary trends.

**[14, 15]** Rate-making is a process which envisions a projection of past experience into the future to provide for a reasonable profit and nothing more. However, such a prognostication can hardly be expected to achieve exact precision. Should hindsight reveal that rates validly instituted have failed to produce a reasonable profit, this would not warrant a recoupment of that deficit by an otherwise unjustified increase in future rates. This would constitute retroactive rate-making which this Court has expressly repudiated in another area of rate-making. *Utilities Comm. v. City of Durham,* 282 N.C. 308, 193 S.E. 2d 95. Further, the disapproval of a rate increase because of a "cushion" created by previously implemented and approved charges is not within the statutory authority granted the Commissioner by G.S. 58-248 to approve premium rates "for the future." The erroneous approval of past rates does not permit the disapproval of otherwise justified rates for the future. *See Utilities Comm. v. Edmisten, Atty. General,* 291 N.C. 451, 232 S.E. 2d 184.

We hold that the Commissioner properly made a finding, based upon substantial evidence, that "unallocated loss adjustment expenses did not rise at the same rate as the losses . . . . " However, he erred by taking into consideration past excess profits derived from previously approved and implemented rates.

**[16]** It is argued that the Commissioner's order is in violation of substantive constitutional provisions.

It is clear that the legislative intent in enacting Chapter 58 was to insure that the public be provided with insurance rates which are not "excessive, inadequate, unreasonable, unfairly discriminatory or otherwise not in the public interest." G.S. 58-248; G.S. 58-248.1.

In accord with due process, Chapter 58 provides for notice of hearing and full hearings. The Commissioner may act only with the specific statutory authority granted to him and his findings and order must be based upon substantial evidence. Chapter 58 further expressly provides that the Commissioner's decision may be revised, modified or remanded for further proceedings if the appellate court finds that the substantial rights of an appellant have been prejudiced because the Commissioner's findings, inferences, conclusions or decisions are:

(1) In violation of constitutional provisions, or

(2) In excess of statutory authority or jurisdiction of the Commissioner, or

(3) Made upon unlawful proceedings, or

(4) Affected by other errors of law, or

(5) Unsupported by material and substantial evidence in view of the entire record as submitted, or

(6) Arbitrary or capricious.

We find nothing in the Commissioner's order which violates constitutional guarantees of due process or which subjects appellees to confiscatory rates.

[17] Finally, we consider whether the Commissioner's order was in violation of procedural constitutional provisions in that the Commissioner acted arbitrarily and capriciously and in the role of a consumer advocate.

A cursory examination of this record discloses that the proceedings between the Rate Office and the Commissioner of Insurance were adversary in nature. However, we must presume that both ultimately sought to establish insurance rates which were in the public interest. Suffice it to say that this record does not establish that the Commissioner acted arbitrarily or capriciously or that he assumed the role of consumer advocate in such a manner that his order violated constitutional procedural provisions.

This cause is remanded to the Court of Appeals with direction that it be remanded to the Commissioner of Insurance for proceedings in accord with this opinion.

Modified and remanded.