STATE OF NORTH CAROLINA ex rel COMMISSIONER OF INSURANCE v. NORTH CAROLINA AUTOMOBILE RATE ADMINISTRATIVE OFFICE, NATIONWIDE MUTUAL INSURANCE COMPANY, STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, ALLSTATE INSURANCE COMPANY, THE AETNA CASUALTY AND SURETY COMPANY, THE TRAVELERS INDEMNITY COMPANY, HARTFORD ACCIDENT AND INDEMNITY COMPANY, GREAT AMERICAN INSURANCE COMPANY, UNITED STATES FIDELITY AND GUARANTY COMPANY, LUMBERMEN'S MUTUAL CASUALTY COMPANY, LIBERTY MUTUAL INSURANCE COMPANY, IOWA NATIONAL MUTUAL INSURANCE COMPANY, ST. PAUL FIRE AND MARINE INSURANCE COMPANY, UNIGUARD MUTUAL INSURANCE COMPANY, MARYLAND CASUALTY COMPANY, THE SHELBY MUTUAL INSURANCE COMPANY, AMERICAN MOTORISTS INSURANCE COMPANY AND AMERICAN MUTUAL LIABILITY INSURANCE COMPANY

No. 89

(Filed 11 November 1977)

1. Insurance § 79.3— automobile insurance—subclassification surcharges—use of DMV point system

In this proceeding to revise rate classifications for automobile insurance pursuant to G.S. 58-30.3 and former G.S. 58-30.4, there was material and substantial evidence in the record to support the Insurance Commissioner's approval of subclassification surcharge plans for liability and collision insurance based upon calculations derived from operator license statistics maintained by and a penalty point system used by the Department of Motor Vehicles.

2. Insurance § 79.1— automobile insurance—rate classifications—Commissioner's approval of proposal by his own staff

If orders by the Commissioner of Insurance essentially approving a reclassification plan for automobile liability and collision insurance proposed by his staff constituted a disapproval in toto of a filing by the Automobile Rate Administrative Office and the promulgation of an entirely new plan of reclassification, the Commissioner usurped the primary authority of the Rate Administrative Office to make such a promulgation in the first instance. However, if the Commissioner's orders constituted an approval in part, or a modification or revision of the Rate Administrative Office plan, then the orders are authorized by statute provided they do not reduce premiums then being collected under the coverages in question beyond whatever reduction, if any, would result from the Rate Administrative Office plan.

3. Insurance § 79.1— automobile insurance—rate classifications—Commissioner's approval of proposal by his own staff

The Commissioner of Insurance did not usurp the rate making function of the Automobile Rate Administrative Office in violation of G.S. 58-248 and 58-248.1 by orders essentially approving an automobile insurance rate reclassification plan proposed by his own staff where the orders constituted an

approval in part of the filing by the Rate Administrative Office and merely revised or modified the plan proposed by the filing.

**4. Insurance § 79.1— automobile insurance—rate classifications—premiums from surcharges**

Former G.S. 58-30.4 required that premiums collected from surcharges provide not less than 25 percent of all automobile insurance premiums which had theretofore been rated, in part, on the basis of age or sex. This would include premiums derived from total limits bodily injury and property damage liability coverages, medical payments coverages, and collision coverages, but would not include comprehensive coverages which have not heretofore been classified for rating purposes on the basis of age or sex.

**5. Insurance § 79.3— automobile insurance—rate reclassification plan—absence of requisite findings**

Orders by the Commissioner of Insurance approving a reclassification plan for automobile liability and collision insurance were insufficient in that the Commissioner failed to make the following ultimate factual findings: (1) the total premiums on affected coverages available to the companies under the present primary and subclassification scheme; (2) the total of such premiums estimated to be generated by the new primary classification plan; and (3) the total of such premiums estimated to be generated by the new subclassification plan.

**6. Insurance § 79.3— automobile insurance—primary classifications—statutory mandate**

Former G.S. 58-30.4 mandated that the four primary, or basic, classifications named in the statute be used in the revised primary classification plan for automobile insurance and prohibited the use of more than those four primary classifications; therefore, the Commissioner of Insurance exceeded his authority under the statute when he divided the "commuter" class into two subclasses for liability insurance and when he established only three primary classifications for collision insurance.

**7. Insurance § 79.3— automobile insurance—rate classification plan—erroneous orders—proceeding superseded by new proceeding—no remand**

Although the Commissioner of Insurance exceeded his authority in ordering into effect primary automobile liability and collision classifications contrary to statutory provisions, and the absence of requisite specific findings of fact in the Commissioner's orders precludes adequate judicial review of the orders, this proceeding will not be remanded to the Commissioner of Insurance for further action since the statutes under which the proceeding took place have been repealed or substantially amended and this proceeding has, in effect, been completely superseded by new proceedings under new statutes.

APPEAL by the Commissioner of Insurance from an unpublished[1] decision of the North Carolina Court of Appeals filed

---

1. *See* Rule 30(e), N.C.R. App. P., published at 288 N.C. 737 (1975).

18 August 1976 reversing and remanding an order of the Commissioner of Insurance relating to automobile liability insurance and vacating a second order of the Commissioner relating to automobile collision insurance. Since Judge Martin dissented from the decision the appeal comes to us as a matter of right.[2] The case was argued as No. 148 at the Fall Term 1976.

*Rufus L. Edmisten, Attorney General, by Isham B. Hudson, Jr.; Hunter & Wharton, by John V. Hunter III, Attorneys for plaintiff appellant.*

*Allen, Steed and Allen, P.A., by Arch T. Allen, Thomas W. Steed, Jr., and Arch T. Allen III; Broughton, Broughton, McConnell & Boxley, P.A., by J. Melville Broughton, Jr.; Young, Moore, Henderson & Alvis, by Charles H. Young; Manning, Fulton & Skinner, by Howard E. Manning, Attorneys for defendant appellees.*

*William T. Joyner, Attorney for North Carolina Fire Insurance Rating Bureau as amicus curiae.*

EXUM, Justice.

This appeal raises questions regarding the validity of two orders entered by the Commissioner for the purpose of implementing General Statutes 58-30.3 and 58-30.4.[3]

---

2. *See* G.S. 7A-30(2).

3. These statutes were ratified by the North Carolina General Assembly on 18 June 1975 as Chapter 666 of the 1975 Session Laws. Codified as G.S. 58-30.3 and 58-30.4 they provide:

"§ 58-30.3. *Discriminatory practices prohibited.* — No insurer shall after September 1, 1975, base any standard or rating plan for private passenger automobiles or motorcycles, in whole or in part, directly or indirectly, upon the age or sex of the persons insured.

"§ 58-30.4. *Revised classifications and rates.* — The North Carolina Automobile Rate Administrative Office shall file with the Commissioner of Insurance for his approval or other action as provided in G.S. 58-248.1 a revised basic classification plan and a revised subclassification plan for coverages on private passenger (nonfleet) automobiles in this State affected by the provisions of G.S. 58-30.3. Said revised basic classification plan will provide for the following four basic classifications, to wit: (i) pleasure use only; (ii) pleasure use except for driving to and from work; (iii) business use; and (iv) farm use. The North Carolina Automobile Rate Administrative Office shall file with the Commissioner of Insurance for his approval or other action as provided in G.S. 58-248.1 a revised subclassification plan with premium surcharges for insureds having less than two years' driving experience as licensed drivers, or having a driving record consisting of a record of a chargeable accident or accidents, or having a driving record consisting of a conviction or convictions for a moving traffic violation or violations, or any combination thereof. Said subclassification plan shall be designed to provide not less than one fourth of the total premium income of insurers in writing and servicing the aforesaid coverages in this State.

"The revised basic classification and subclassification plans specified in this section shall supersede the existing basic classification and subclassification plans on the hereinabove specified coverages.

"The Commissioner is authorized and directed to implement the plans provided for in this section on September 2, 1975."

In essence these statutes, introduced in the General Assembly and hereinafter referred to as House Bill 28, sought to prohibit the use of age or sex as criteria for rating operators of private passenger automobiles for automobile insurance purposes and to insure that a larger proportion, "not less than one fourth," of the premium income of automobile insurers be derived from those insureds who either had poor driving records or were inexperienced drivers or who fell in both categories. Pursuant to a notice issued by the Commission on 19 June 1975 the North Carolina Automobile Rate Administrative Office (hereinafter "Rate Office") filed a proposed plan with the Commissioner for implementing House Bill 28. Lengthy hearings were conducted on this plan in the course of which the Insurance Department staff offered an alternative plan for implementing this legislation. Testimony critical and supportive of the Rate Office plan and the staff plan was heard. After the hearings the Commissioner, on 26 August 1975, entered two orders, one relating to automobile liability insurance and the other to automobile collision insurance in which he ordered into effect his staff's plan of reclassification.

By its exceptions and assignments of error to the orders of the Commissioner brought forward in its brief the Rate Office contends: (1) the orders are not supported by competent and sufficient evidence; (2) the orders are not supported by requisite findings of fact; (3) by the entry of these orders the Commissioner exceeded his statutory authority; (4) the orders are unconstitutionally confiscatory; and (5) the Commissioner, by acting arbitrarily and capriciously as a "consumer advocate" rather than as an impartial adjudicator in the conduct of the hearings, denied them due process of law. The Fire Insurance Rating Bureau as *amicus curiae* contends that House Bill 28 is unconstitutional in that it authorizes the Rate Office to make the filing for reclassifying physical damage coverages. The Commissioner contends to the contrary and thus the legal issues are joined before us.

## I.  FACTUAL BACKGROUND

This is not a proceeding seeking either an increase or a decrease in automobile insurance rates. Rather is it a proceeding instituted for the purpose of reclassifying automobiles and automobile operators for rate making purposes pursuant to the mandates of House Bill 28. To accomplish such a reclassification is necessarily a factually complex undertaking involving dozens of

detailed statistical and mathematical calculations designed to insure that the total premiums collected under the new classifications will be the same, or as nearly the same as is reasonably possible to predict, as the total premiums collected under the old classifications.

The following factual statement may seem tedious. In truth it only touches on the main factual components underlying the principal legal disputes in the case.

## A. *Liability Coverages*

The present primary automobile classification plan for liability insurance is sometimes referred to as a "nine class plan." In fact it is essentially a plan whereby automobiles are classified according to four basic uses: (1) strictly pleasure; (2) pleasure except for driving to and from work; (3) trade or business; and (4) farm. To get the lowest rate, however, for each of these uses, the car must not be operated by a male driver who is under 25 years of age. Special and considerably higher rates apply to automobiles which are operated by males under 25.[4] Automobiles used by commuters to and from work are further subdivided into three subclasses. The base rate applies if the automobile is driven less than 10 miles one way and is in a small town. Such an automobile if driven in a larger town carries a rating factor of 1.10 times the base rate; and an automobile driven more than 10 miles one way to work carries a rating factor of 1.45. The farm use rating factor is .75 and the business use rating factor is 1.5. There is also a multi-car discount of 20 percent if two or more automobiles are insured under certain specified conditions.

Superimposed upon this primary classification system is a subclassification known as the Safe Driver Insurance Plan.[5] The present SDIP assigns points up to a total of 10 to drivers with certain motor vehicle offenses and "chargeable" accidents[6] on their records. The points are assessed according to schedules in

4. For example, a rate 3.6 times the base rate applies to any automobile which is owned or principally operated by a male under 25. Somewhat reduced rates apply to automobiles operated by males under 25 if the automobile is used for farming purposes.

5. The statutory authority for the plan is G.S. 58-248.8 and its predecessors.

6. A "chargeable" accident is one caused by the negligence of the operator who is to be "charged" with it.

rate filings made by the Rate Office.[7] Two points are assessed for each chargeable accident involving more than $200 damage to property other than the insured vehicle or bodily injury (hereinafter "serious accident"), and one point for two or more chargeable accidents resulting in similar damage of $200 or less (hereinafter "minor accident"). Drivers accumulate their points during an experience period which is defined as the three years next preceding the driver's date of application or preparation of a renewal for insurance. A driver with no points on his record gets a 10 percent discount off the premium otherwise charged provided the principal operator of the insured car has been licensed for three years or more. There is a gradually increasing rate differential for the accumulation of points up to 10. The differential is expressed in terms of a percentage of the premium otherwise charged which is then figured and added to that premium.[8] The differentials apply separately to each coverage purchased other than comprehensive coverages.[9]

As we have noted, House Bill 28 was designed to eliminate primary classifications utilizing sex or age as a criterion and to give safe drivers a premium reduction to be offset by increasing the premiums to be paid by inexperienced drivers and those drivers with motor vehicle offenses or chargeable accidents on their records. House Bill 28 has three primary mandates: The first is that the primary rating classification plan must use only

---

7. Under the present plan, as we understand the record in this case, *one point* is assessed for illegal passing, speeding in excess of 55 mph but not in excess of 75 mph, following too closely, driving on wrong side of road, and any other moving traffic violation as a result of which an operator's license was suspended or revoked; *three points* for "hit and run" offense involving only property damage, reckless driving, passing a stopped school bus, and speeding in excess of 75 mph; *six points* for operating a motor vehicle during a period of license suspension; *eight points* for driving under the influence of intoxicating liquor or narcotics, highway racing, and transportation for the purpose of sale of illegal intoxicating liquor; and *ten points* for vehicular manslaughter or negligent homicide, pre-arranged highway racing, and "hit and run" driving involving bodily injury or death. *One point* would be assessed for any other moving traffic violation in excess of two.

8. The rate differentials for the points assessed are as follows:

| No. of Driving Points | Rate Differential |
|---|---|
| 0 | −   10% |
| 1 | +    5% |
| 2 | +   20% |
| 3 | +   35% |
| 4 | +   50% |
| 5 | +   75% |
| 6 | +  100% |
| 7 | +  125% |
| 8 | +  150% |
| 9 | +  175% |
| 10 or more | +  200% |

9. The differentials would apply separately to coverages for bodily injury liability, property damage liability, medical payments, and collision.

Comr. of Insurance v. Automobile Rate Office

four classifications, to wit, pleasure use only; commuter use; business use; and farm use. Second, the safe driver plan must provide premium surcharges for insureds having (1) less than two years driving experienced as licensed operators, (2) a driving record consisting of "one or more chargeable accident or accidents" or (3) a conviction of "one or more moving violations." Third, the safe driver plan shall be designed so that it produces not less than 25 percent of the "total income premiums" collected by automobile insurers.

The Rate Office plan for implementing House Bill 28 provided for four primary classifications based on automobile use. The classes and their rating factors were: pleasure use (1.00), commuter use (1.15), business use (1.50), and farm use (.80). The plan provided for a multi-car discount of 15 percent. The Rate Office proposed a subclassification plan similar to the one already in effect in that it utilized a point system contained in the rate filings.[10] Two points would be assessed for each serious chargeable accident and one point for each minor chargeable accident. Two points would be given for each inexperienced operator (an operator licensed less than two years) of the vehicle. The points may be accumulated up to a total of 12 under the new plan for the same experience period as defined under the present plan.

Having thus purported to comply with the first two mandates of House Bill 28, the Rate Office's proposed plan then sought to assign dollar values to the base rate (pleasure use) on minimum limits liability (bodily injury and property damage) coverage and to the surcharges which would be assessed for operator points. The calculations began with the total premiums realized from minimum limits liability rates from all primary classifications. The amount was $223,446,003. Seventy-five percent of this amount was then used as the sum which the primary classification minimum limits liability rates must produce. After accounting for differentials due to the multi-car discount and assigning certain percentages of distribution to each of the four

---

10. The new plan provided that *two points* would be assessed for illegal passing, speeding in excess of 55 mph but not in excess of 75 mph, following too closely, or driving on the wrong side of the road; *four points* for "hit and run" driving involving only property damage, reckless driving, passing a stopped school bus or speeding in excess of 75 mph; *eight points* for operating a motor vehicle during a period of license suspension or revocation; *ten points* for driving a motor vehicle while under the influence of intoxicating liquor or narcotics, transporting illegal intoxicating liquors by motor vehicle for the purpose of sale, and highway racing; *twelve points* for vehicular manslaughter or negligent homicide, pre-arranged highway racing or "hit and run" driving involving bodily injury or death. *One point* would be assigned for any other moving traffic violation.

primary classifications and relating these to all carrier exposures[11] for the year ending 30 June 1974, the figure of $65 was mathematically calculated as the base rate (pleasure use) for minimum limits liability coverages.

The Rate Office plan then calculated the dollar amount which would have to be surcharged for each operator point under the safe driver plan in order to produce the remaining part, or 25 percent, of premiums collected for minimum limits liability coverages. The calculated amount was $25 per point. In calculating this amount the Rate Office proposal used various data: (1) the number of exposures in each point category under the present SDIP for the year ended 30 June 1974 redistributed under point categories in its proposed plan; (2) data supplied by the National Driving Center based on a 10 percent sample of North Carolina Department of Motor Vehicle operator license records; (3) a sample of drivers insured by Nationwide Insurance Company; and (4) the Rate Office's own "estimates" and "actuarial judgments." The surcharge amount of $25 per point was calculated to be 38 percent of the base premium of $65. From this calculation the Rate Office's proposal provided for a subclassification rating factor of .38 for each point accumulated. The base premium, i.e., $65 would, in other words, be multiplied by a factor of .38 for each point accumulated under the surcharge plan. The result would be added to whatever premium was otherwise applicable.[12]

---

11. An "exposure" was defined by Rate Office testimony as "one unit of automobile coverage for a one year period, in other words, one car insured for twelve months. That's not the same thing as the driver."

12. The rating factors are shown in a tabular form submitted by the Rate Office as follows:

RATING FACTORS
AND STATISTICAL CODES

| Driving Record Sub-Classification | Primary Classifications | | | |
|---|---|---|---|---|
| | Pleasure Use (1A-111) | Driven to or from Work (1B-112) | Business Use (3-130) | Farm Use (1AF-115) |
| 0 | 1.00 | 1.15 | 1.50 | 0.80 |
| 1 | 1.38 | 1.53 | 1.88 | 1.18 |
| 2 | 1.76 | 1.91 | 2.26 | 1.56 |
| 3 | 2.14 | 2.29 | 2.64 | 1.94 |
| 4 | 2.52 | 2.67 | 3.02 | 2.32 |
| 5 | 2.90 | 3.05 | 3.40 | 2.70 |
| 6 | 3.28 | 3.43 | 3.78 | 3.08 |
| 7 | 3.66 | 3.81 | 4.16 | 3.46 |
| 8 | 4.04 | 4.19 | 4.54 | 3.84 |
| 9 | 4.42 | 4.57 | 4.92 | 4.22 |
| 10 | 4.80 | 4.95 | 5.30 | 4.60 |
| 11 | 5.18 | 5.33 | 5.68 | 4.98 |
| 12 | 5.56 | 5.71 | 6.06 | 5.36 |
| NE | 1.38 | 1.53 | 1.88 | 1.18 |

Two or More Automobiles Credit — A factor of .15 shall be subtracted from the Rating Factors indicated above if the company insures two or more four-wheel private passenger automobiles (other than antique automobiles) owned by an individual or husband and wife resident in the same household.

Under the Rate Office plan total premiums derived from minimum limits liability coverage rates under the new primary classifications would be $167,584,501. While the Rate Office breakdown was not presented in this fashion, for easier comparison with the staff plan, surcharges under the new Rate Office subclassification plan could be broken down as follows: (1) inexperienced drivers, $10,000,000;[13] (2) serious chargeable accidents, $6,711,845;[14] (3) minor chargeable accidents, $1,250,000;[15] (4) exposures not eligible for lowest rate, $703,900;[16] and (5) other motor vehicle offenses, $37,195,757. These figures when added constitute the sought for total premium revenue of $223,446,003 on minimum limits rates plus surcharges.

The Insurance Department staff recommended a primary classification plan which differed from that proposed by the Rate Office in these respects: the plan divided the commuter use class into two subdivisions, large towns and small towns. The small town use class paid the same base rate as those in the pleasure use class. The rating factor for large town use, however, was 1.10. The rating factor for farm use was .75, and the multi-car discount was 20 percent. Using the base rate now in effect of $70.24 for minimum limits liability coverages (bodily injury and property damage) and accounting for a multi-car discount of 20 percent, and using primary classification differentials and distributions similar to those used by the Rate Office, the department staff arrived at a "present average rate" for each of its new primary classifications. It multiplied these present average rates by the number of cars, respectively, insured in each class, to arrive at present total premiums produced under these rates of $163,884,397. It then subtracted this figure from the total required revenue of $223,446,003 to arrive at the revenue which must be produced under House Bill 28 from surcharges, the result of which was $59,561,606, or more than the required 25 percent.

To produce this amount of revenue from its safe driver plan, the department staff recommended using essentially the same point system for licensed operators as that maintained by the

13. An estimated 200,000 such drivers multiplied by $50 (two surcharge points).

14. An estimated 134,236 such drivers multiplied by $50 (two surcharge points).

15. An estimated 50,000 such drivers multiplied by $25.

16. 28,156 exposures multiplied by $25.

Department of Motor Vehicles pursuant to General Statute 20-16(c).[17] The staff's plan, in addition, assigned 12 points for any violation which resulted in suspension of a driver's license by the Department of Motor Vehicles, the greater of 9 points or the sum of the violation points for three moving violations within a 12-month period, the greater of 6 points or the sum of violation points for two moving violations in a 12-month period, and the greater of 8 points or the sum of violation points for the accumulation of 8 or more points within the three-year period immediately following the reinstatement of a license which had theretofore been suspended or revoked for traffic violations.

The staff plan then assigned a surcharge in terms of a flat dollar amount for each point category,[18] a surcharge of $60 for each serious chargeable accident, $25 for *two* or more minor chargeable accidents, and $40 for each operator of an insured vehicle with less than two years driving experience. The staff calculated the anticipated premium revenues from its surcharge plan as follows: (1) inexperienced drivers, $8,000,000;[19] (2) major

17. This statute provides for assessment of points as follows:

| Driving Offense | Points |
| --- | --- |
| Passing stopped school bus | 5 |
| Reckless driving | 4 |
| Hit and run, property damage only | 4 |
| Following too close | 4 |
| Driving on wrong side of road | 4 |
| Illegal passing | 4 |
| Running through stop sign | 3 |
| Speeding in excess of 55 miles per hour | 3 |
| Failing to yield right-of-way | 3 |
| Running through red light | 3 |
| No operator's license or license expired more than one year | 3 |
| Failure to stop for siren | 3 |
| Driving through safety zone | 3 |
| No liability insurance | 3 |
| Failure to report accident where such report is required | 3 |
| All other moving violations | 2 |

18. The dollar values assigned were:

| Points | Surcharge |
| --- | --- |
| 2 | $ 10.00 |
| 3 | 20.00 |
| 4 | 30.00 |
| 5 | 60.00 |
| 6 | 90.00 |
| 7 | 120.00 |
| 8 | 160.00 |
| 9 | 200.00 |
| 10 | 240.00 |
| 11 | 280.00 |
| 12 | 320.00 |

19. 200,000 (the estimated figure used by the Rate Office) × $40.

chargeable accidents, $21,000,000;[20] (3) minor chargeable accidents, $400,000;[21] (4) other driving record point surcharges, $30,389,300.[22] It was figured that the total premium revenues from surcharges would amount to $59,789,300, or somewhat more than the $59,561,606 determined to be required from the subclassification plan by House Bill 28.

The Commissioner's final order on the liability aspect of the case adopts essentially his staff's recommended reclassification plan. It sets a base premium for minimum limits liability at $61 and establishes rating factors as follows: Pleasure use, 1.00; commuter use (small towns) 1.00; commuter use (large towns), 1.10; business use, 1.50; and farm use, .75. It also puts into effect the point system and surcharges proposed by his staff.

### B. *Physical Damage Coverages*

Reclassification of physical damage coverages was marred by a peculiar difficulty. House Bill 28 requires that the filing for both physical damage and liability coverages be made by the Rate Office. Other statutes in effect in 1975,[23] however, gave to the North Carolina Fire Insurance Rating Bureau (hereinafter "Rating Bureau"), the duty of maintaining statistical data and filing rates having to do with first party physical damage insurance including automobile collision and comprehensive coverages. G.S. 58-125, *et seq.* Under these statutes the Rating Bureau has traditionally made filings for automobile physical damage coverages including collision and various comprehensive type coverages. *See, e.g., Comr. of Insurance v. Rating Bureau,* 292 N.C. 70, 231 S.E. 2d 882 (1977). The record in this case indicates that while many insurance companies belong to both the Rate Office and the Rating Bureau, some companies write only physical damage coverages. These companies would be members of the Rating Bureau but not the Rate Office. House Bill 28, therefore, created a novel situation in automobile rate making in North Carolina which naturally perplexed both the Rate Office and the Rating Bureau vis-a-vis this particular filing.

---

20. 350,000 (an estimated figure testified to by a department staff witness) × $60.

21. 16,000 (an estimated figure testified to by a department staff witness) × $25.

22. This amount was figured by multiplying the number of licensed drivers in each point category as determined by Department of Motor Vehicles statistics by the dollar surcharge for that point category and adding the results.

23. These statutes were repealed effective 1 September 1977 by Chapter 828, 1977 Session Laws.

Comr. of Insurance v. Automobile Rate Office

In any event, counsel for the Rating Bureau was present during the hearings on this filing. Both he and counsel for the Rate Office stated during the course of the hearings that in their opinion House Bill 28 did give responsibility for the physical damage filing to the Rate Office. The Commissioner made it clear at the outset of the hearings that in his opinion it was the duty of the Rate Office to make the filing. The Rate Office did include a proposal for reclassifying collision and comprehensive coverages at the same time it made its proposal for reclassifying liability coverages. The information relating to these physical damage coverages, however, was qualified by the statement that it was submitted "for information purposes only." At the conclusion of the hearing on liability coverages the Rate Office moved to delete this qualification on its original filing and asked to be allowed to submit additional exhibits in connection with those already submitted as its proposal for reclassification of physical damage coverages. There were stipulations entered by the Rate Office and the Insurance Department staff to the effect that neither party objected, on the ground of lack of notice, to the collision exhibits offered by the respective parties at the close of these hearings; that all evidence presented by both parties in connection with the liability coverage filing could also apply to the physical damage filing; and that each party had the right to submit at the close of the evidence certain late filed exhibits with respect to calculations in the physical damage exhibits offered by the other party.

Very little evidence was heard on the physical damage phase of the case. The record is sparse. As best we can tell from it, however, there is presently in effect a basic classification plan for *collision* coverages consisting essentially of five classes.[24] The base rate is applied to the pleasure use class. The other classes and their rating factors are: business use (1.25); farm use (.70); and automobiles used by males under 25 (1.19 if the male is married or not the owner or principal operator, and 2.25 if the male is unmarried and the principal operator). The farm use category has a rating factor of 1.19 if the automobile is operated by a male driver under 25 who is either married or not the owner or principal operator, and 1.58 if the male driver is unmarried and owns

24. Apparently comprehensive coverages have never in the past been classified according to automobile use or operator status.

or principally operates the car. There is, furthermore, a multi-car discount of 10 percent.

The Rate Office proposed a basic classification scheme for collision *and* comprehensive coverages using four classes with rating factors as follows: pleasure use (1.00); commuter use (1.15); business use (1.50); and farm use (.80). The Rate Office also proposed that its subclassification, or surcharge, plan for liability coverages be applied to collision and comprehensive coverages.[25] It proposed a multi-car discount of 15 percent.

The department staff, on the other hand, proposed a basic classification scheme for *collision* coverages only with rating factors as follows: pleasure and commuter use (1.00); business use (1.25); and farm use (.70). It also proposed a multi-car discount of 10 percent. The department staff's position was that since comprehensive coverages had never been classified nor were they subject to safe driving surcharges, House Bill 28 simply had no application to comprehensive coverage premiums. The staff, consequently, proposed surcharges in flat dollar amounts for each point category from two to twelve for collision coverages only.[26] The amount of the surcharges was calculated as follows: Using the number of licensed drivers in each point category as obtained from Department of Motor Vehicles statistics and assuming that 55 percent of these drivers buy collision insurance (37 percent, $100 deductible, 18 percent, $50 deductible), the number of insureds in each point category for each type coverage was derived. The amount of premiums necessary under the collision surcharge plan was calculated by figuring 25 percent of the total premiums earned at present premium levels. Using then the distributions in

---

25. It is not clear how the plan would be so applied. Apparently the Rate Office intended that premiums otherwise applicable be multiplied by the factor of .38 per point, and the result added to the premiums. There are no calculations submitted, however, to show the result of this application.

| 26. Description | $50 Deductible | $100 Deductible |
|---|---|---|
| 2 points | $ 7 | $ 4 |
| 3 points | 14 | 8 |
| 4 points | 21 | 12 |
| 5 points | 42 | 24 |
| 6 points | 63 | 36 |
| 7 points | 84 | 48 |
| 8 points | 112 | 64 |
| 9 points | 140 | 80 |
| 10 points | 168 | 96 |
| 11 points | 196 | 112 |
| 12 points | 224 | 128 |
| Inexperienced | 28 each | 16 each |
| 2 or more Chargeable Accidents Less than $200 | 18 | 10 |
| Major Accident | 42 each | 24 each |

each point category for each type coverage, the amount of the surcharge for each point category was calculated so as to produce the required 25 percent of total premium volumes on collision coverages.

The Commissioner in his collision reclassification order adopted his staff's plan.

## II.  THE ORDERS OF THE COMMISSIONER

Both the liability insurance order and the collision insurance order contain almost identical preliminary recitations. In both orders there are findings of fact which compare the different mathematical approaches and the different kinds of statistical data used, respectively, by the Rate Office and the department staff in arriving at the reclassifications which each proposed.

In the liability order the Commissioner found as a fact that the primary classification plan proposed by the Rate Office would increase by 7 percent the rates for those automobiles in the primary commuter use category driven less than 10 miles to work in small towns (the largest single primary class of insured automobiles), decrease the multi-car discount from 20 percent to 15 percent, and decrease the farm use discount from 25 percent to 20 percent. On the other hand he found that the department plan retained the present multi-car and farm use discounts and did not increase the present safe driver rates for any primary class.

With regard to the surcharge proposals he found that the Rate Office plan used the Rate Office's own system for assessing points according to its judgment of the seriousness of the various kinds of driving offenses. It also placed the same value on each point. The department staff's plan, on the other hand, used the point system devised by the General Assembly, tracking, there-fore, the General Assembly's judgment regarding the seriousness of various driving offenses. This plan also used "a progressive surcharge scale" which placed a greater burden "upon the habitual offender."

He found that the overall result of the Rate Office plan would be to. "produce rates and classifications . . . which are unreasonable, unfairly discriminatory, unwarranted, improper, and otherwise not in the public interest"; but that overall the department staff plan "is actuarially sound and will produce rates

and classifications . . . which are reasonable, adequate, not unfairly discriminatory, and in the public interest."

In the collision order the Commissioner found that the Rate Office plan would increase the safe driver rate for automobiles used in commuting to work, decrease the farm discount from 30 percent to 20 percent, and increase the multi-car discount from 10 percent to 15 percent. On the other hand he found that the department staff plan would result in no increase in existing safe driver rates and no change in the farm use or multi-car discounts. Regarding the overall result of the respective collision surcharge plans, he made findings identical to those in his liability insurance order.

In both orders the Commissioner concluded that House Bill 28 required the Rate Office to file revised classification plans for automobile liability and collision insurance with the Commissioner for his approval "or other action as provided in General Statute 58-248.1"; that General Statute 58-248.1 authorized him to alter or revise any rate or classification so as "to produce rates and classifications which are reasonable, adequate, not unfairly discriminatory, and in the public interest"; that General Statute 58-248.1 authorized him to proceed on his own motion to revise rates and classification systems so as to produce those which are reasonable, adequate, not unfairly discriminatory and in the public interest; that the Rate Office plan would not produce such rates and classifications; that the department plan was actuarially sound and would produce such rates and classifications; that the Rate Office plan should be altered to the extent set forth in the department plan; and the department plan met the requirements of House Bill 28 and G.S. 58-248.1.

In his collision insurance order the Commissioner also concluded:

"That no automobile physical damage coverage except collision is subject to that part of House Bill 28 codified as G.S. 58-30.4, because collision is the only automobile physical damage coverage, for which the rates are currently based upon the age or sex of the persons insured."

## III.   RECENT LEGISLATION

Before discussing the legal challenges to the Commissioner's orders, we note that the 1977 General Assembly enacted new and comprehensive legislation for the purpose of regulating insurance rate making. The caption of House Bill 658, enacted as Chapter 828 of the 1977 Session Laws, indicates the scope of its provisions. It is entitled,

> "AN ACT TO REPEAL ARTICLES 13, 13A, 13B AND 25 OF GENERAL STATUTES CHAPTER 58 RELATING TO THE FIRE INSURANCE RATING BUREAU, FIRE AND CASUALTY INSURANCE RATE REGULATIONS, AND REGULATION OF AUTOMOBILE LIABILITY INSURANCE RATES; TO PROVIDE A NEW METHOD OF RATE REGULATION; AND TO AMEND CHAPTERS 58 AND 97 TO CONSOLIDATE THE FUNCTIONS OF THE FIRE INSURANCE RATING BUREAU, THE COMPENSATION RATING AND INSPECTION BUREAU, AND THE AUTOMOBILE RATE ADMINISTRATIVE OFFICE; AND TO ASSURE THE PROPER OPERATION OF THE NORTH CAROLINA REINSURANCE FACILITY ON A SUSTAINING BUT NON-PROFIT BASIS."

Chapter 828 did repeal those articles of Chapter 58 mentioned in its caption.[27] It amended General Statute 58-30.4 substantially.[28] Thus Chapter 828 either repealed or substantially amended the very statutes upon which both the Rate Office and the Commissioner rely in this proceeding, the Commissioner to find the source of his authority, and the Rate Office to find limitations it contends he has exceeded.

---

27. Article 13 created and delegated duties and power to the North Carolina Fire Insurance Rating Bureau. Article 13A was devoted to casualty insurance rating regulations. Article 13B dealt with rate regulations of miscellaneous lines. Article 25 dealt specifically with regulation of automobile liability insurance rates.

28. The new version of this statute, with amendments emphasized, reads:

"The North Carolina *Rate Bureau shall promulgate* a revised basic classification plan and a revised subclassification plan for coverages on private passenger (nonfleet) *motor vehicles* in this State affected by the provisions of G.S. 58-30.3. Said revised basic classification plan will provide for the following four basic classifications to wit: (i) pleasure use only; (ii) pleasure use except for driving to and from work; (iii) business use; and (iv) farm use. The North Carolina *Rate Bureau shall promulgate* a revised subclassification plan *which appropriately reflects the statistical driving experience and exposure of insureds in each of the four basic classifications provided for above, except that no subclassification shall be promulgated based, in whole or in part, directly or indirectly, upon the age or sex of the person insured. Such revised subclassification plan may provide for* premium surcharges for insureds having less than two years' driving experience as licensed drivers, *and shall provide for premium surcharges for drivers* having a driving record consisting of a record of a chargeable accident or accidents, or having a driving record consisting of a conviction or convictions for a moving traffic violation or violations, or any combination thereof, *and the premium income from insureds subject to this premium surcharge* shall provide not less than one-fourth of the total premium income of insurers in writing and servicing the aforesaid coverages in this State. *The classification plans and subclassification plans so promulgated by the bureau shall be subject to the filing, hearing, disapproval, review and appeal procedures before the Commissioner and the courts as provided for rates and classification plans in G.S. 58-128, G.S. 58-129, and G.S. 58-130.*"

Chapter 828 prohibits excessive, inadequate, or unfairly discriminatory rates and defines these terms. It provides for criteria to be considered in determining whether any rate complies with the statute. It establishes the North Carolina Rate Bureau which is

"To assume the functions formerly performed by the North Carolina Rating Bureau, the North Carolina Rate Administrative Office, and the Compensation Rating and Inspection Bureau of North Carolina, with regard to the promulgation of rates, for insurance . . . for theft of and physical damage to private passenger (nonfleet) motor vehicles . . . for liability insurance for such motor vehicles, automobile medical payments insurance, uninsured motorists coverage and other insurance coverages written in connection with the sale of such liability insurance . . . . "

Chapter 828 took effect on 1 September 1977. Section 58-127 of Chapter 828 directs the North Carolina Rate Bureau "to establish and implement a comprehensive classification rating plan for motor vehicle insurance under its jurisdiction within 90 days of the effective date hereof. No such classification plans shall base any standard or rating plan for private passenger (nonfleet) motor vehicles, in whole or in part, directly or indirectly, upon the age or sex of the persons insured."

We judicially note, *Utilities Comm. v. Southern Bell Telephone Co.*, 289 N.C. 286, 221 S.E. 2d 322 (1976), that the newly established Rate Bureau filed with the Commissioner on 1 September 1977 a new and comprehensive classification scheme purporting to comply with G.S. 58-30.4 as amended. The proposed effective date of the newly filed classification plan as provided therein is 1 December 1977. On 30 September 1977 the Commissioner gave notice that he would begin public hearings on the plan on 31 October 1977. Presumably these hearings are now in progress.

Our decision in this proceeding must, of course, be based on law as it existed in 1975. What we decide here may have some bearing on the proceedings presently before the Commissioner. These proceedings are not now before us and we make no determination of the extent to which our decision here may control them. Suffice it to say that it will control only to the extent that

the provisions of Chapter 828 of the 1977 Session Laws are similar to those provisions of Chapter 58 of the General Statutes under which these 1975 proceedings were conducted.

We proceed now to consider the legal contentions raised in this case.

## IV. LEGAL CHALLENGES TO THE COMMISSIONER'S ORDERS

### A.  *Sufficiency of Supporting Evidence*

[1]  General Statute 58-9.6(b)(5) provides that a court reviewing a decision of the Commissioner may reverse if the decision is "unsupported by material and substantial evidence in view of the entire record as submitted." The Rate Office contends that the orders here are unsupported by such evidence. The Rate Office's argument is that the Commissioner's orders are based on calculations derived from statistical data maintained by the Department of Motor Vehicles relating to the number of *licensed drivers* in the state broken down into the various point categories maintained by that department.[29] The Rate Office would have preferred calculations based on its own data which is keyed to the number of insurance exposures in various point categories.[30] The Rate Of-

---

29. The staff's calculations upon which the Commissioner's orders are based are as follows:

| Points | No. of Drivers 1-1-75 | Surcharge | Revenue |
|---|---|---|---|
| 2 | 178,645. | $ 10 | $  1,786,450 |
| 3 | 223,306 | 20 | 4,466,120 |
| *4 | 70,922 | 30 | 2,127,660 |
| 5 | 41,571 | 60 | 2,494,260 |
| *6 | 35,381 | 90 | 3,184,290 |
| *7 | 18,196 | 120 | 2,183,520 |
| *8 | 10,100 | 160 | 1,616,000 |
| *9 | 5,434 | 200 | 1,086,800 |
| *10 | 2,977 | 240 | 714,480 |
| *11 | 1,677 | 280 | 469,560 |
| *12 | 32,063 | 320 | 10,260,160 |

Revenue from point of surcharges using           30,389,300
    1-1-75 cut-off date

*Using defined points as per ID22 Section II

30. The Rate Office figures are:

| Insurance Points | Exposures |
|---|---|
| 1 | 0 |
| 2 | 227,282 |
| 3 | 0 |
| 4 | 73,075 |
| 5 | 0 |
| 6 | 19,527 |
| 7 | 0 |
| 8 | 22,819 |
| 9 | 1,482 |
| 10 | 9,585 |
| 11 | 687 |
| 12 | 6,619 |
| | 361,076 |

fice argues that by using Department of Motor Vehicles statistics the staff has overstated premiums available from surcharge points. This is so, it contends, because not every licensed driver owns a private passenger, nonfleet automobile. Many of them operate automobiles owned by others, for example, taxicab drivers, truck drivers, and employees of companies who drive company cars. Furthermore, it contends that the lack of insurance experience with a surcharge system based upon motor vehicle points makes it impossible accurately to estimate the amount of surcharge premiums which can reasonably be expected.

The staff's position, however, was based on the testimony of one Phillip K. Stern, the property liability actuary in the New Jersey Department of Insurance. Stern has been in his present position since December, 1970. He had also been employed as an actuary for twenty years by the Mutual Insurance Rating Bureau and for four years with the National Bureau of Casualty Underwriters, a predecessor of the Insurance Services Office. He is an associate of the Casualty Actuarial Society and a member of the American Academy of Actuaries. He was qualified, without objection, as an expert in the field of automobile insurance rate making and classification plans.

Stern justified the use of motor vehicle statistics to derive an actuarially sound classification plan. He said that while many licensed operators did operate cars owned by someone else they generally also owned a personal car for themselves, their spouses, or other family members which would be insured under private passenger, nonfleet, coverages and operated by the licensed drivers in question. Their motor vehicle operator points would be reflected on the policies.

He also defended the use of a surcharge system based on point penalties assessed by the Department of Motor Vehicles pursuant to applicable public statutes enacted by the General Assembly. His view was that such a system came nearer to serving the public interest than an "insurance point" option. The public, he said, could better understand it. Stern was critical, moreover, of the industry generally for not assiduously policing the surcharge system now in effect. He claimed that if the companies would properly police the system, they would find that the figures upon which the staff relied did not overstate the premiums available.

Rate Office witnesses claimed that it cost too much to run drivers' license checks on everyone who applied for automobile insurance. They relied, for the most part, on the applicant's truthfulness in making out an application. Most of the companies relied on a spot check type system. Some of the smaller companies apparently did a more thorough job of checking the driving records of new applicants.

We had occasion to criticize the use of motor vehicle statistics in *Comr. of Insurance v. Automobile Rate Office*, 287 N.C. 192, 214 S.E. 2d 98 (1975). The criticism, however, was not directed to the statistics per se. It was directed to the use there made of them. We concluded that the statistics as used in that case did not support the conclusions of the Commissioner. Here the motor vehicle statistics used by the staff were shown by the testimony of Stern to have viability in these proceedings. The credibility of his testimony was for the Commissioner to determine.

There is nothing sacrosanct about so-called "insurance statistics." Rate Office witnesses conceded that some of their data regarding the number of insureds in point categories was based largely on estimates and "actuarial judgments" of their experts. For example, one witness conceded that the data from which they derived the number of insureds presently in point categories 6 through 10 was based on a sample submitted by one company which was so small that it would not normally be considered "creditable." The Rate Office had no data with regard to the number of inexperienced operators licensed less than two years or the number of insureds with one or two minor traffic violations. For these figures it relied on data supplied by the National Driving Center, which in turn was taken in part from operator statistics maintained by the Department of Motor Vehicles.

Witnesses for both sides conceded that in establishing any new classification system, particularly one in which motor vehicle violations had to be differentially rated for surcharge purposes, a large amount of judgment must be exercised. Estimates must, of necessity, be used. There is no way precisely to predict the result of a new classification scheme. Results obtainable must, in the final analysis, await experience.

Insurance data compiled by the Rate Office, insofar as it is shown to be reliable and fairly compiled, is valuable and should be

considered. The Commissioner may also consider evidence, otherwise competent, from other sources. *Comr. of Insurance v. Automobile Rate Office, supra,* 287 N.C. 192, 203, 214 S.E. 2d 98, 105 (1975). *See generally, In re Filing by Fire Ins. Rating Bureau,* 275 N.C. 15, 165 S.E. 2d 207 (1969).

It is true, of course, that the insurance industry in this state has had no experience with a surcharge system based on points assessed by the Department of Motor Vehicles. Lack of such experience should not preclude changing the system if the changes can be justified. There is evidence in this record that the change inaugurated by the Commissioner is in the public interest. Common sense tells us, and the witness Stern testified, that the public will better understand and accept a point system for insurance surcharges which is based on points accumulated on driving records assessed by the Department of Motor Vehicles. Both insureds and insurers then have equal access to and knowledge of surcharge points. The present system in which "insurance points" differ from "motor vehicle points," and are ascertainable only by a check of the latest rate filing, may encourage a feeling among insureds that they are being subjected to a kind of mysterious, secret point code known only to the initiated.

We decline, then, to disturb the Commissioner's orders on the ground that they were based in part on calculations derived from operator license statistics maintained by and a penalty point system used by the Department of Motor Vehicles.

B. *The Usurpation Question: General Statutes 58-248 and 58-248.1*

The Rate Office contends the Commissioner exceeded his statutory authority in that by approving essentially the reclassification plan proposed by his staff he usurped the rate making function of the Rate Office in violation of General Statutes 58-248 and 58-248.1.

In several recent decisions we have considered the authority of the Commissioner vis-a-vis that of the Rate Office in fixing automobile insurance rates. The principles in these decisions apply equally to proceedings designed to fix rate classifications. The

operative statutes are 58-248 and 58-248.1, the provisions of which apply with equal force to rates and rate classifications.[31]

In determining that the Commissioner had exceeded his authority under these statutes in *Comr. of Insurance v. Automobile Rate Office*, 287 N.C. 192, 214 S.E. 2d 98 (1975), we noted that Chapter 58 of the General Statutes vested the Rate Office "with primary authority to fix, adjust and propose rates subject to the approval or disapproval of the Commissioner." We said that although this Chapter gave the Commissioner "broad regulatory and supervisory powers for overseeing the faithful execution of the insurance laws," it did not give him "concurrent authority with the Rate Office to fix or reduce rates."

In *Comr. of Insurance v. Rating Bureau*, 291 N.C. 55, 229 S.E. 2d 268 (1976), the Rating Bureau had filed for a reduction in certain extended coverage and windstorm insurance rates. The final order of the Commissioner required a reduction in these rates in excess of that proposed by the Rating Bureau. Applying General Statutes 58-131.1 and 58-131.2,[32] statutes similar to 58-248 and 58-248.1, we said, "[t]he two methods overlap in the sense that in passing upon a proposal submitted by the Bureau the Commissioner need not approve or disapprove such proposal in its entirety but upon proper findings of fact supported by substantial

31. These statutes provide in pertinent part:

"G.S. 58-248. *Personnel and assistants; general manager; submission of rate proposals to Commissioner of Insurance; approval or disapproval.* —

. . . .

"The Commissioner shall approve proposed changes in rates, classifications or classification assignments to the extent necessary to produce rates, classifications or classification assignments which are reasonable, adequate, not unfairly discriminatory, and in the public interest."

"G.S. 58-248.1. *Order of Commissioner revising improper rates, classifications and classification assignments.* — Whenever the Commissioner, upon his own motion or upon petition of any aggrieved party, shall determine, after notice and a hearing . . . that a classification or classification assignment is unwarranted, unreasonable, improper or unfairly discriminatory he shall issue an order to the bureau directing that such rates, classifications or classification assignments be altered or revised in the manner and to the extent stated in such order to produce rates, classifications or classification assignments which are reasonable, adequate, not unfairly discriminatory, and in the public interest."

32. These statutes provide in pertinent part:

"G.S. 58-131.1. *Approval of rates.* — No rating method, schedule, classification, underwriting rule, bylaw, or regulation shall become effective or be applied by the Rating Bureau until it shall have been first submitted to and approved by the Commissioner."

"G.S. 58-131.2. *Reduction or increase of rates.* — The Commissioner is hereby empowered to investigate at any time the necessity for a reduction or increase in rates. If upon such investigation it appears that the rates charged are producing a profit in excess of what is fair and reasonable, he shall order such reduction of rates as will produce a fair and reasonable profit only.

"If upon such investigation it appears that the rates charged are inadequate and are not producing a profit which is fair and reasonable, he shall order such increase of rates as will produce a fair and reasonable profit."

evidence, may fix premium rates at a level such as to allow part but not all of the increase [or decrease] proposed by the Bureau." 291 N.C. at 65, 229 S.E. 2d at 274.

In *Comr. of Insurance v. Automobile Rate Office*, 292 N.C. 1, 231 S.E. 2d 867 (1977), this Court had before it a filing by the Rate Office on 1 July 1974 seeking a reduction of 13.3 percent for bodily injury automobile liability insurance and an increase of 22.5 percent for property damage liability insurance, or an overall average increase of .9 percent. Hearings were conducted. The Commissioner finally ordered a reduction of 23.8 percent in bodily injury rates and an increase of 2.5 percent in property damage rates for an overall average reduction of 13 percent. We held the Commissioner was authorized to approve a part only of a proposed increase in rates but that he lacked authority to order a decrease in rates in excess of that proposed by the Rate Office. We said that under General Statutes 58-248 and 58.248.1 the Commissioner's authority was "to approve the filing in toto, approve the filing in part, or disapprove the filing." If he disapproved the filing in toto, he must under General Statutes 58-248.1 order the Rate Office to "alter or revise" existing rates so as to produce rates which are, in the language of G.S. 58-248, "reasonable, adequate, not unfairly discriminatory, and in the public interest." We said:

> "By so doing he would have left the matter open so that the Rate Office, the agency which possessed the primary authority to fix a just and adequate rate, might have an opportunity to propose adjustments in conformity with his decision." 292 N.C. at 11, 231 S.E. 2d at 873.

[2] Applying these principles to the case, we conclude that if the Commissioner's orders constituted a disapproval in toto of the Rate Office filing and the promulgation of an entirely new plan of reclassification, then he has usurped the primary authority of the Rate Office to make such a promulgation in the first instance. On the other hand if his orders constitute an approval in part, or a modification or revision of the Rate Office plan, then the orders are authorized by the applicable statutes provided they do not reduce premiums then being collected under the coverages in question beyond whatever reduction, if any, would result from the Rate Office plan.

[3]   We conclude, after careful examination of the Rate Office filing and the Commissioner's orders, that the orders constitute an approval in part of the filing. The orders revise, or modify, the plan proposed by the Rate Office. There are many similarities in both proposals. The plans are the same, for example, with regard to the distribution of overall and multi-car exposures among the primary classifications, the number of inexperienced operators subject to a surcharge, and the use of an additive rather than a multiplicative surcharge plan (at least with regard to minimum limits liability coverages). Many rule changes and definitions relating to methodology by which premiums are figured under the reclassifications are the same. The plan adopted by the Commissioner differs from the filing, for the most part, in that it (1) retains rather than increases present rates for the primary classifications; (2) uses a method for assessing points which tracks a method already promulgated by the General Assembly rather than that traditionally used and found only in filings by the Rate Office; and (3) assigns different dollar values to the various point categories.

Whether the Commissioner's orders will result in a substantial premium shortfall to the industry we find, for the reasons given below, impossible to answer on this record.

C.  *Adequacy of the Commissioner's Findings of Fact*

We agree with the Rate Office's contention that the Commissioner's orders do not contain adequate factual findings.

If the Commissioner's orders result in a decrease in total premiums collected for coverages in question beyond whatever reduction, if any, is proposed by the Rate Office, he has acted in excess of his authority under the authorities just discussed. If they result in a decrease in such premiums which were being collected at the time of the filing, then he has exceeded his authority under House Bill 28. This bill provides, as we noted at the outset of this opinion, for a reclassification, not a reduction or an increase, overall, in rates. Hence premiums collected under the new classifications should be, as nearly as can be reasonably predicted, the same as those collected under the old classifications. Both the Commissioner and the Rate Office agree on this proposition. Both the Rate Office filing and the staff plan ostensibly use data and calculations designed to produce this result.

House Bill 28 also requires that subclassification surcharges produce "not less than" 25 percent of the "total premium income" of insurers.

The Rate Office contends that the Commissioner's orders will result in a premium shortfall of $18,900,000 or 5.6 percent of the companies' "total premium revenue" of $336,800,000 and will not produce surcharges comprising 25 percent of the total premium income. These shortfalls will result, it says, because (1) the subclassification surcharges approved by the Commissioner will not apply to increased limits, but only to minimum limits liability coverages, nor will they apply to medical payments coverages, and (2) the orders are based on overstatements of the number of insureds who buy collision coverages and the number of serious chargeable accidents available for surcharges.

There was evidence offered by the Rate Office to support the existence of these overstatements. The staff offered evidence to the contrary. Whether the surcharge plan approved by the Commissioner would apply to medical payments coverages and if so, how, is a question left hopelessly confused by the Commissioner's orders.

[4] It seems reasonably clear that neither the Rate Office filing nor the plan approved by the Commissioner was designed to take into account *increased limits* liability premiums. Liability calculations supporting both plans were designed to produce surcharges which would constitute 25 percent of *minimum limits* liability premiums. Insofar as bodily injury and property damage liability premiums are concerned, the surcharges under both plans would not vary, whether the insured purchased the minimum or the highest possible liability limits. Both plans were touted in testimony and in the briefs as using "additive-type" rather than "multiplicative-type" surcharges so that all insureds in the same point category would pay the same surcharge on any type coverage purchased regardless of the amount of the coverage. While this is a laudable achievement, it should not be based on the assumption that House Bill 28 requires that surcharges produce 25 percent of premiums attributable to minimum limits coverages only, or 25 percent of some, but not all, kinds of coverages affected. We interpret the act to mean that premiums collected from surcharges must provide *not less than* (they may provide more) 25 percent of all premiums realized from all

coverages which had theretofore been rated, in part, on the basis of age or sex. This would include premiums derived from total limits bodily injury and property damage liability coverages, medical payments coverages, and collision coverages. It would not include comprehensive coverages which have not heretofore been classified by rating purposes on the basis of age or sex.

Regarding the applicability of the approved surcharge plan to medical payments coverages, the state of the record is this: The staff witness, Stern, the only witness who explained the staff's plan, testified that the "intent" of the plan was that the applicable surcharges would be applied once against an "entire line" of insurance. He defined "line" as being the "liability line" on one hand and the "collision line" on the other. Under this interpretation an insured with, for example, four points who purchased any amount of bodily injury and property damage liability coverage and medical payments coverage would pay a surcharge of $30. *See* n. 18, *supra.* The Commissioner's order may not so provide. While it recites the adoption of the staff's plan, in both the liability and collision orders the rule relating to the applicability of the surcharge plan provides, "The provisions of this rule apply separately to premiums for bodily injury, property damage, medical payments and collision." We interpret this to mean that under the Commissioner's order an insured with four points who buys bodily injury, property damage, and medical payments coverages would pay a surcharge of $90.[33] The different methods of applying the surcharge plan will thus result in a considerable difference in the amount of premiums to be ultimately recovered.

Because, therefore, of the evidentiary conflict compounded by the ambiguity in the Commissioner's orders, there are certain fundamental factual issues which need to be, but haven't been, resolved by the Commissioner as a prerequisite for any kind of meaningful judicial review.

[5] We said in *In re Filing by Fire Insurance Rating Bureau,* 275 N.C. 15, 39-40, 165 S.E. 2d 207, 224 (1969):

"The ultimate question to be determined by the Commissioner is whether an increase in premium rates is necessary in order to yield a 'fair and reasonable profit' in the im-

---

33. The $30 surcharge would apply to all three coverages rather than only once to the entire liability "line." *See* n. 18, *supra.*

mediate future (i.e., treating the Bureau as if it were an operating company whose experience in the past is the composite of the experiences of all of the operating companies), and, if so, how much increase is required for that purpose. This cannot be determined without specific findings of fact, upon substantial evidence, as to (1) the reasonably anticipated loss experience during the life of the policies to be issued in the near future, (2) the reasonably anticipated operating expenses in the same period, and (3) the percent of Earned Premiums which will constitute a 'fair and reasonable profit' in that period."

The ultimate factual findings which should have been but were not made by the Commissioner in this proceeding were: (1) the total premiums on affected coverages available to the companies under the present primary and subclassification scheme; (2) the total of such premiums estimated to be generated by the new primary classification plan; and (3) the total of such premiums estimated to be generated by the new subclassification plan. The Commissioner's orders find simply that the plans approved "will produce rates and classifications . . . which are reasonable, adequate, not unfairly discriminatory and in the public interest . . . ." Any revision of rates or rate classifications must ultimately produce such rates because of the mandate of General Statute 58-248.1. This finding, though, standing alone, is insufficient to enable us to determine on this record whether the Commissioner has also complied with House Bill 28.

D. *Compliance with House Bill 28: Primary Classifications*

[6] We agree with the Rate Office's contention that the Commissioner exceeded his authority under House Bill 28 by establishing five instead of four primary classes in his liability order, and three instead of four classes in his collision order. House Bill 28 requires that the new classification plan "will provide for the following four basic classifications, to wit: (i) pleasure use only; (ii) pleasure use except for driving to and from work; (iii) business use; and (iv) farm use." In his liability order the Commissioner subdivided the second named class into large town and small town commuters. In his collision order he provided for, in effect, only three classes: pleasure and commuter use, business use, and farm use.

The question is one of statutory construction. Specifically, what did the General Assembly intend by the use of the word "basic" in the phrase "four basic classifications." Is "basic" used in the sense that subdivisions less than "basic" are permitted? Or is it used to distinguish the four primary classifications from the surcharge subclassifications? We are confident that the word is used in the latter sense.

The primary function of a court in construing legislation is to insure that the purpose of the legislature in enacting it, sometimes referred to as legislative intent, is accomplished. *In re Filing by Fire Insurance Rating Bureau, supra,* 275 N.C. 15, 34, 165 S.E. 2d 207, 220 (1969). The best indicia of that legislative purpose are "the language of the statute, the spirit of the act, and what the act seeks to accomplish." *Stevenson v. City of Durham,* 281 N.C. 300, 303, 188 S.E. 2d 281, 283 (1972). A court may also consider "the circumstances surrounding [the statute's] adoption which throw light upon the evil sought to be remedied." *Milk Commission v. Food Stores,* 270 N.C. 323, 332, 154 S.E. 2d 548, 555 (1967).

Clearly one of the purposes of the act was to simplify the primary classification scheme for automobile insurance. The proliferation of primary classifications was one of the evils sought to be remedied by House Bill 28. To permit more than four primary, or basic, classifications under the guise of subclassifications would be directly contrary to both the letter and spirit of this enactment. The Commissioner exceeded his authority by dividing the commuter class into two subclasses.

Since the statute mandated *four* primary, or basic, classifications, the Commissioner likewise exceeded his authority thereunder when he established only three such classifications in his collision order.

### E. *The Constitutional Issues*

The Rate Office contends finally that it was denied due process of law in a substantive sense because the Commissioner's orders resulted in confiscatory insurance rates. It claims further that it was denied procedural due process of law because the Commissioner acted not as an impartial hearing officer but rather as a consumer advocate whose mind from the outset of the hear-

ing was closed to any other proposal than that of his own staff.[34] The Commissioner contends, on the other hand, that he is entitled as an elected public official to protect the public's interest in these kinds of proceedings so long as rates and classifications ultimately approved meet statutory mandates.

The North Carolina Fire Insurance Rating Bureau as amicus curiae contends that House Bill 28 was unconstitutional in that it gave authority to the Rate Office, rather than the Rating Bureau, to make the filing for reclassifying automobile collision and other physical damage coverages.

For the reasons stated in our conclusion, we determine to vacate the orders of the Commissioner. Consequently, we deem it unnecessary to determine the constitutional questions raised.

## CONCLUSION

[7] The Commissioner exceeded his authority in ordering into effect primary liability and collision classifications contrary to the provisions of House Bill 28. The absence of requisite specific findings of fact precludes adequate judicial review of the orders. These kinds of errors would normally result in our vacating these orders and remanding the case to the Commissioner for further proceedings. *Comr. of Insurance v. Automobile Rate Office, supra,* 292 N.C. 1, 231 S.E. 2d 867 (1977); *Comr. of Insurance v. Automobile Rate Office, supra,* 287 N.C. 192, 214 S.E. 2d 98 (1975); *In re Filing by Fire Insurance Rating Bureau, supra,* 275 N.C. 15, 165 S.E. 2d 207 (1969). Since, however, the statutes under which this proceeding took place have been either repealed or substantially amended effective 1 September 1977 and a new classification plan has been filed by the newly created North Carolina Rate Bureau, hearings on which are presumably now in progress, it would be futile to remand this case. This proceeding has, in effect, been completely superseded by the new proceedings under new statutes. *See Utilities Commission v. Southern Bell Telephone Co.,* 289 N.C. 286, 221 S.E. 2d 322 (1976).

Because, however, some similarities remain between the old and new statutes, particularly the provisions of House Bill 28 and its amended version contained in Chapter 828 of the 1977 Session

---

34. We rejected a similar argument made by the Rate Office in *Comr. of Insurance v. Automobile Rate Office,* 292 N.C. 1, 27, 231 S.E. 2d 867, 881 (1977).

Laws, we did not conclude, as we did in *Southern Bell*, that the controversy was, in all respects, moot. A decision on those aspects of the case we have discussed would, we felt, be helpful in the new proceedings.[35]

For the reasons given herein the decision of the Court of Appeals vacating the orders of the Commissioner is

Affirmed.

---

35. After this opinion was prepared and the day before it was filed the Commissioner apparently approved the 1 September 1977 filing of the Rate Bureau. *News and Observer*, 11 November 1977 at 1, col. 4.