IN THE SUPREME COURT OF NORTH CAROLINA

No. 188PA24

Filed 22 August 2025

IN THE MATTER OF:

E.H. & R.H.

On discretionary review pursuant to N.C.G.S. § 7A-31 and on writ of certiorari pursuant to N.C.G.S. § 7A-32(b) to review a divided decision of the Court of Appeals, 294 N.C. App. 139 (2024), affirming in part, vacating in part, and remanding an order entered on 25 May 2023 by Judge J.H. Corpening II in District Court, New Hanover County. Heard in the Supreme Court on 16 April 2025.

*Jill R. Cairo and Mona E. Leipold for petitioner-appellant New Hanover County Department of Social Services; and Quintin D. Byrd for appellant Guardian ad Litem.*

*The Law Group, by Christian J.W. Jones, L. Bryan Smith, and Melissa Gott; and Godwin Law Firm, by David M. Godwin, for respondent-appellee parents.*

*Marc S. Gentile and Jason Hicks for North Carolina Association of Social Services Attorneys, amicus curiae.*

DIETZ, Justice.

This juvenile case is another in a series of recent decisions by the Court of Appeals that seem determined to ignore our precedent. The well-reasoned dissent below points out the glaring flaws in the majority opinion. We could simply reverse for the reasons in that opinion, but we take this opportunity to emphasize—again—two principles of abuse, neglect, and dependency law that seem to confound certain

panels of the Court of Appeals.

First, when assessing allegations of neglect based on the abuse of another child in the same home, the mere fact that the abuse occurred is insufficient to support the adjudication. But if a child is severely abused in the parents' care and the parents cannot provide any plausible explanation for how the abuse occurred and any assurance that the abuse will not happen again, these facts can support a determination that other children in the same home are at substantial risk of similar abuse and therefore live in an injurious environment. *See In re A.W.*, 377 N.C. 238, 248–49 (2021); *In re A.J.L.H.*, 384 N.C. 45, 55–56 (2023).

Second, appellate courts may not make arguments for parties in these juvenile cases that those parties chose not to assert for themselves. This case presents an example of why we have this rule. As the dissent points out, the majority's legal analysis of these unpreserved issues is flawed on many levels. Worse yet, the majority published its opinion, making this misguided analysis a binding precedent. We limit appellate review to issues raised by the parties because those "legal issues are joined" after full adversarial briefing. *State ex rel. Comm'r of Ins. v. N.C. Auto. Rate Admin. Off.*, 293 N.C. 365, 368 (1977). Without the benefit of that briefing, courts risk misunderstanding the record or announcing a legal rule that is simply wrong. Thus, outside of issues impacting the court's jurisdiction, appellate review is limited to the issues raised by the parties. *See In re R.A.F.*, 384 N.C. 505, 512 (2023).

Applying these two principles here, we reverse the decision of the Court of

Appeals for the reasons explained below.

**Facts and Procedural History**

Respondents are the parents of two children: R.H., born in 2017, and E.H., born in 2022. When E.H. was born, the attending doctor described him as "a standard healthy newborn," and he was discharged from the hospital with no health conditions. Just three weeks later, respondent-mother brought E.H. to the emergency room. She told the doctors that she had heard a "pop" during a diaper change earlier that day, which she and respondent-father believed came from E.H.'s shoulder. According to respondent-mother, E.H. stopped using his right arm immediately after the "pop," but she did not take E.H. to the hospital until seven hours later, after she, respondent-father, and the two children went to Walmart and visited with family.

An x-ray of E.H.'s right arm revealed that he had a fractured arm bone, which an on-duty doctor concluded "had occurred within the last 7-10 days prior to the x-ray." The hospital then ordered a full skeletal survey. While the survey was ongoing, a doctor spoke with respondent-mother. Respondent-mother again claimed that she heard a "pop" during a diaper change, so the doctor had her demonstrate how respondents handled E.H. The doctor noted that "there was nothing during the demonstration given which would explain [E.H.'s] broken arm." Respondent-mother again "denied any trauma or incident had occurred to [E.H.'s] arm or to any other part of his body."

A radiologist reviewed E.H.'s full skeletal survey and confirmed that the infant

had a fractured arm bone. The radiologist also observed several additional fractures on E.H.'s shin and thigh bones. He noted that all the fractures were "acute" with "no evidence of healing," and concluded that the injuries had "occurred no more than 10 days prior to the skeletal survey" and therefore could not have been the result of birth trauma.

The radiologist described E.H.'s injuries as "virtually pathognomonic of nonaccidental trauma" and explained that "these types of injuries are only caused with abuse." Specifically, the types of fractures E.H. sustained "are caused when the baby is shaken with force great enough to shear the cartilage and bone." The radiologist and other doctors at the hospital conducted further tests and ruled out other potential causes of the injuries.

The New Hanover County Department of Social Services responded to a report about E.H.'s unexplained injuries. Respondent-mother maintained her diaper change story when she spoke privately to a social worker with DSS. Respondent-mother again denied observing any accidents or trauma that might explain E.H.'s injuries.

The social worker also went to the family's home to speak to respondent-father, who had not visited the hospital since E.H. was admitted. Respondent-father repeated respondent-mother's story about the "pop" during the diaper change and "denied any falls, accidents, trauma or other incident which could have caused the multiple fractures." Respondent-father likewise demonstrated how respondents handled E.H. during the diaper change, but this demonstration also did not reveal

anything that could explain the infant's injuries.

Respondents confirmed that they were E.H.'s sole caretakers and that E.H. was not in anyone else's care before his hospitalization. Respondent-mother also told DSS that E.H. had not been out of her sight since his birth a few weeks earlier.

DSS obtained nonsecure custody of both E.H. and his older brother R.H., who was then four years old. E.H. later received treatment from medical specialists who concluded that his injuries were likely the result of "blunt force trauma" and "indirect force, such as shearing, twisting or shaking." One treating physician stated that there was "no way" E.H. "could have experienced the trauma necessary to cause his injuries without his caregivers being aware of it."

Following a hearing, the trial court adjudicated E.H. as abused and neglected and adjudicated his older brother R.H. as neglected. The trial court's order is highly detailed, with eighteen pages of factual findings. Those findings include a determination by the trial court that, because respondents could not plausibly explain E.H.'s injuries and refused to accept responsibility for those injuries, "this renders their home an injurious environment for any juvenile as there are no reasonable means to protect any juvenile from a similar injury occurring in the home":

> 71. Given the family's circumstances and living arrangements from mid-April through May 8, 2022, [R.H.] was necessarily present in the home when the injuries were inflicted on [E.H.]. Without either Respondent-Parent taking accountability or providing any plausible explanation for [E.H.]'s injuries, there is a substantial risk of both [E.H.] and [R.H.] of being subjected to physical abuse and neglect in that household. Due to his tender

years, [R.H.] is at risk for being subjected to the same infliction of injuries as [E.H.].

72. The parents, as the only caretakers for [E.H.], are responsible for his injuries. The Court cannot determine if a parent does not know what happened, knows what happened and will not tell on the other parent, or is the parent who inflicted the injuries. The Respondent-Parents continue to maintain that they are not responsible for these injuries, and as such, this renders their home an injurious environment for any juvenile as there are no reasonable means to protect any juvenile from a similar injury occurring in the home. The Court currently cannot separate the parents as to culpability and has no way to address the issues as long as each parent maintains his/her current position that he or she did not injure the child and does not know how the child was injured. The Juveniles would be at risk if placed back in the home with Respondent-Mother and/or Respondent-Father.

Following the trial court's entry of the order on adjudication and disposition, respondents timely appealed.

The Court of Appeals issued a divided decision. *In re E.H.*, 294 N.C. App. 139 (2024). The court unanimously held that there was sufficient evidence to support E.H.'s abuse and neglect adjudications. *Id.* at 152. But the majority vacated the trial court's adjudication of R.H. as neglected, holding that the trial court relied "solely on the abuse or neglect of E.H." and made no findings of "any prior abuse of R.H. or other evidence predictive of probable neglect." *Id.* at 150–51. The majority remanded the case for the trial court to make additional findings, if appropriate, concerning the probability of future neglect of R.H. *Id.* at 151.

The dissent reasoned that "the trial court's extensive and detailed findings of

fact, all of which are supported by the record and are binding on appeal, are more than sufficient to support the adjudication of neglect as to R.H." *Id.* at 152 (Stroud, J., concurring in part and dissenting in part). The dissent also criticized portions of the majority's analysis, such as the discussion of marital privilege, that were not raised by the parties or preserved for appellate review. *Id.* at 152–62.

DSS petitioned for discretionary review with respect to the adjudication of R.H. and respondents petitioned for discretionary review with respect to the adjudication of E.H. We allowed DSS's petition and denied respondents' petition.

**Analysis**

We allowed discretionary review in this case to reaffirm precedent from this Court that we believed was settled but that continues to confuse certain panels of the Court of Appeals.

We begin by examining the legal standard for an adjudication of neglect under the Juvenile Code. Section 7B-101(15) defines a "neglected juvenile" using a list of criteria including a juvenile whose parent "does not provide proper care, supervision, or discipline" or a juvenile whose parent "creates or allows to be created a living environment that is injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15) (2023). Importantly, after the enumerated list of neglect criteria, section 7B-101(15) also expressly states that "in determining whether a juvenile is a neglected juvenile, it is *relevant* whether that juvenile . . . lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home." *Id.*

(emphasis added).

In a number of recent decisions, we have examined what section 7B-101(15) means when it says that abuse or neglect of another juvenile in the same home is "relevant" to a neglect analysis. *See, e.g.*, *In re J.A.M.*, 372 N.C. 1, 9–10 (2019); *In re D.W.P.*, 373 N.C. 327, 339–40 (2020); *In re A.W.*, 377 N.C. 238, 248–49 (2021); *In re A.J.L.H.*, 384 N.C. 45, 55–56 (2023).

In these cases, we reaffirmed longstanding precedent holding that a "court may not adjudicate a juvenile neglected *solely* based upon previous Department of Social Services involvement relating to other children," and that there must be "the presence of other factors to suggest the neglect or abuse will be repeated." *In re J.A.M.*, 372 N.C. at 9–10 (emphasis added). But we also recognized that those "other factors" can be circumstances surrounding the abuse itself that indicate other children in the home could face similar harm. *In re A.J.L.H.*, 384 N.C. at 55.

Thus, when another child in the same home has suffered some abuse or injury, the trial court should assess how and why that harm occurred, whether other children in the home could be subject to that same harm, and whether the parents display a willingness to "remedy the injurious environment" that caused the harm so that it cannot occur again. *Id.* at 56; *In re A.W.*, 377 N.C. at 249. Facts that can demonstrate a parent's unwillingness to remedy the injurious environment include offering an "implausible explanation" for the abuse of another child, "failing to acknowledge" another child's abuse, or "insisting that the parent did nothing wrong when the facts

show the parent is responsible for the abuse." *In re A.J.L.H.*, 384 N.C. at 56; *see also In re A.W.*, 377 N.C. at 248–49.

So, for example, in *In re D.W.P.*, we upheld the trial court's neglect determination for an older sibling based on abuse of the younger sibling because that determination was "supported by the court's findings that respondent-mother has failed to acknowledge her responsibility" and "her inability to pinpoint the cause" of the younger sibling's injuries. 373 N.C. at 340. These findings supported "the trial court's conclusion that the neglect is likely to reoccur if the children are returned" to the mother's care. *Id.*

Likewise, in *In re A.W.*, we upheld the trial court's neglect determination for a juvenile whose sibling died in the mother's care because the mother "continued to provide the implausible explanation" for how the sibling died and "there were no means by which the court could determine what caused" the sibling's death. 377 N.C. at 248–49. We reasoned that, without acknowledging the factors the led to the sibling's death, the mother "did not remedy the injurious environment" that caused that death and therefore put the other juvenile in the home "at a substantial risk of impairment." *Id.* at 249.

Finally, in *In re A.J.L.H.*, we upheld the trial court's neglect determination for two juveniles whose older sibling had been abused because, although the parents admitted to the facts constituting the abuse, they refused "to recognize that it *was* abuse," and thus were unable "to commit to never repeating it." 384 N.C. at 56. As a

result, the trial court properly found that the younger siblings "likewise faced harm if they remained in the home." *Id.*

Here, the trial court properly followed our precedent by making appropriate findings, supported by clear, cogent, and convincing evidence, that supported its neglect determination. Specifically, the trial court found that R.H. was a similar "tender" age to his younger sibling E.H., that respondents did not provide "any plausible explanation" for E.H.'s injuries, and that respondents were "responsible" for E.H.'s injuries. The court further found that respondents "continue to maintain that they are not responsible for these injuries, and as such, this renders their home an injurious environment for any juvenile as there are no reasonable means to protect any juvenile from a similar injury occurring in the home."

These findings are sufficient to support a conclusion of neglect under the precedent described above. Nevertheless, the Court of Appeals majority held that the "trial court's findings of fact regarding R.H. rely solely upon E.H.'s abuse and fail to mention any prior abuse of R.H. or other evidence predictive of probable neglect of R.H." *In re E.H.*, 294 N.C. App. at 150. The majority further held that the record was "devoid of any clear and convincing evidence of neglect of R.H., other than the *ipso facto* application of non-confessed and unexplained injuries to E.H." *Id.* at 151.

The majority's reasoning cannot be squared with our precedent. There is no need for the trial court to find a specific pattern of past abuse or specific facts that predict when and how future abuse might occur. Indeed, the facts that the majority

believed were insufficient—that the injuries to E.H. are "non-confessed" and "unexplained"—are precisely the sort of facts that support the trial court's determination. When a child is severely abused in the parents' care, and the parents cannot provide any plausible explanation for how those injuries occurred or assure social workers that the abuse will not happen again, the trial court properly can find that there is an unacceptable risk of similar abuse to other children in that same home in the future.[1] *In re D.W.P.*, 373 N.C. at 339–40; *In re A.W.*, 377 N.C. at 248–49; *In re A.J.L.H.*, 384 N.C. at 55–56.

We therefore agree with the Court of Appeals dissent, which explained that our precedent "demonstrates why the lack of explanation can be so important." *In re E.H.*, 294 N.C. App. at 156 (Stroud, J., concurring in part and dissenting in part). Quoting earlier Court of Appeals precedent, the dissent reasoned that "if a parent is not able to explain how their children were harmed before, there is a risk the children will be harmed the same way again if returned to the parent's custody, and that is a risk our courts are not required to take." *Id.*

In sum, the trial court's adjudication of R.H. as neglected was supported by adequate findings of fact which, in turn, were supported by clear, cogent, and convincing evidence in the record. Accordingly, we reverse the decision of the Court

---

[1] Of course, the trial court is not *required* to make these findings, and there are certainly circumstances in which a trial court could find that other children in the same home are not at risk of similar harm—for example, because of a large difference in age. Our analysis is focused on the majority's mistaken holding that the facts found by the trial court in this case *never* support an adjudication of neglect.

of Appeals with respect to the neglect adjudication of R.H.

This brings us to the second, and more frustrating, error by the majority. After wrongly holding that the trial court's findings of fact were insufficient, the majority also asserted that the trial court's order constituted an "ultimatum" to "confess or lose your children" that violated "marital privilege" and the constitutional "presumption of fitness." *In re E.H.*, 294 N.C. App. at 151. The majority's mandate instructed the trial court to "make additional findings, in the absence of a compelled confession by either parent or violation of the marital privilege." *Id.* at 152.

The dissent correctly points out that "the majority opinion fails to cite any law supporting its position." *In re E.H.*, 294 N.C. App. at 157 (Stroud, J., concurring in part and dissenting in part). The dissent walks through each case cited by the majority and explains why the case has nothing to do with the legal principles the majority claims it does. *Id.* at 157–58. We will not repeat that detailed analysis here. Suffice it to say, if litigants were to cite these cases to us in support of the propositions advanced by the Court of Appeals majority, we would view it as borderline sanctionable misconduct. *See* N.C. R. App. P. 34(a)(1).

More importantly, as the dissent also points out, respondents did not raise any of these arguments in the trial court or in their briefing to the Court of Appeals. *In re E.H.*, 294 N.C. App. at 157 (Stroud, J., concurring in part and dissenting in part). The majority's analysis is part of a recent pattern by certain Court of Appeals panels to make arguments for parties in juvenile cases that those parties chose not to make for

themselves. *See, e.g., In re A.J.L.H.*, 386 N.C. 305, 311–12 (2024). This pattern needs to end. Addressing issues that the parties never raised, preserved, and asserted on appeal is harmful for several reasons.

First, it departs from the well-settled rule in juvenile cases that appellate courts "may not address an issue not raised or argued by respondent for it is not the role of the appellate courts to create an appeal for an appellant." *In re R.A.F.*, 384 N.C. at 512 (cleaned up); N.C. R. App. P. 28(b)(6).

Second, it conflicts with our preservation rules in juvenile cases, which require litigants to timely raise arguments concerning evidentiary privileges or constitutional claims in order to preserve them for appellate review. *See In re J.N.*, 381 N.C. 131, 133 (2022); N.C. R. App. P. 10.

Finally, and most notably here, when an appellate court addresses a legal theory on appeal that has not been tested in the crucible of adversarial briefing, there is much greater risk that the court is missing something and, as a result, is about to mess up the law. That is the case here, where the majority appears entirely unaware that the marital privilege does not apply in these juvenile proceedings. *See* N.C.G.S. § 7B-310 ("No privilege, except the attorney-client privilege, shall be grounds for excluding evidence of abuse, neglect, or dependency in any judicial proceeding."); N.C.G.S. § 8-57.1 (The "husband-wife privilege shall not be ground for excluding evidence regarding the abuse or neglect of a child" in these juvenile proceedings.).

Accordingly, we reject the majority's analysis of these unpreserved issues,

reaffirm that the Court of Appeals should not address issues not raised or argued by the parties, and caution future panels of the Court of Appeals that we expect them to acknowledge and follow this holding. *See In re A.J.L.H.*, 386 N.C. at 311–12 (chastising Court of Appeals panel for addressing an unpreserved constitutional issue on remand after this Court expressly instructed the Court of Appeals *not* to address it on remand).

## Conclusion

We reverse the portion of the Court of Appeals decision addressing the adjudication of R.H. We leave undisturbed the portion of the Court of Appeals decision addressing the adjudication of E.H., which is not part of this appeal.

REVERSED IN PART.